**HOLLINGSWORTH & VOSE COMPANY, Appellant,**

v.

**A–P–A TRANSPORTATION CORP., Appellee.**

No. 97–2428.

United States Court of Appeals, First Circuit.

Heard June 1, 1998.

Decided Oct. 23, 1998.

Leonard M. Singer with whom Heidlage & Reece, P.C. was on brief for appellant.

Thomas J. Hogan with whom Kroll, Rubin & Fiorella LLP was on brief for appellee.

Before BOUDIN, Circuit Judge,
SCHWARZER,* Senior District Judge, and
SARIS,** District Judge.

BOUDIN, Circuit Judge.

Hollingsworth & Vose Company ("Hollingsworth") appeals from the denial of its motion for summary judgment and the grant of summary judgment to A-P-A Transportation Corporation ("A-P-A"). The issue turns on a tariff provision limiting the carrier's liability for goods damaged during shipment in exchange for a lower transportation charge. The federal statute governing such tariff provisions has long been a source of litigation.

The pertinent facts are undisputed. In March 1993, Hollingsworth arranged to ship a large metal cylinder used to produce fabric—the device is called a calendar roll—from its plant in Floyd, Virginia, to KRH Rolls, Inc. ("KRH"), in Orange, Massachusetts. KRH recommended A-P-A as a carrier, and when Hollingsworth agreed, KRH made the shipping arrangements. In preparation, Hollingsworth's shipping clerk filled out a standard bill-of-lading form regularly used by Hollingsworth.[1] In the bill's "name

of carrier" section, the clerk typed "APA Trucking."

Because A-P-A did not serve Floyd, Virginia, it arranged for another carrier, Wilson Trucking Company, to pick up the shipment and deliver it to A-P-A in Lexington, Virginia. Hollingsworth did not learn of this arrangement until Wilson's driver arrived at the plant and told the shipping clerk that he would be taking the calendar roll. Without objection from Hollingsworth, the Wilson driver added "Wilson via Lexington VA" in the "name of carrier" section of the bill of lading. Wilson delivered the calendar roll to A-P-A in a damaged condition.

Hollingsworth sued A-P-A for damages, and both parties moved for summary judgment on a joint stipulation of agreed facts. A-P-A contended that the bill of lading incorporated the terms of Wilson's tariff, duly filed with the Interstate Commerce Commission, limiting Wilson's liability to 10 cents per pound. The magistrate judge wrote a very able opinion concluding that this provision limited the carrier liability. The judge required A-P-A to pay $650 in damages, corresponding to the calendar roll's weight of 6,500 pounds. Hollingsworth's actual loss was substantially higher. This appeal followed.

The 1906 Carmack Amendment to the Interstate Commerce Act addresses a carrier's liability for shipments in interstate commerce. *See* 49 U.S.C. §§ 10730, 11707.[2] Under that statute, a carrier is fully liable for the "actual loss or injury to the property," *id.* § 11707(a), unless—as provided by the Cummins Amendments a decade later—it takes specific actions to limit its liability, *id.* § 10730(b)(1). So far as pertinent here, such actions include two separate steps, one involving the tariff and the other the bill of lading.

---

* Of the Northern District of California, sitting by designation.

** Of the District of Massachusetts, sitting by designation.

1. The Hollingsworth shipping department at the Floyd plant handles eight to ten shipments per day of fabric, and in the six-month period prior to the shipment at issue, it made two calendar roll shipments.

2. These provisions were in force in 1993, at the time of the transaction at issue, and the citations are to the 1994 edition of the United States Code. The provisions were overhauled and renumbered in 1995. *See* ICC Termination Act of 1995, Pub.L. No. 104-88, § 103, 109 Stat. 803, 907-08. Comparable provisions now appear in 49 U.S.C. § 14706 (Supp. I 1995).

First, under 49 U.S.C. § 10730(a), the carrier must maintain a valid tariff with the ICC that contains a limited liability rate but also makes an unlimited liability rate available to the shipper (normally, the rate charged for the latter would be higher). Second, the carrier must also obtain the "written declaration of the shipper or . . . written agreement between the carrier . . . and shipper" as to the "limited" value of the shipment. *Id.* § 10730(b)(1).

It is undisputed in this case that the first requirement (of a compliant tariff) was met. The applicable tariff, which both parties concede to be Wilson's, provides for a maximum liability of 10 cents per pound unless the shipper declares otherwise. No one disputes that under the tariff Hollingsworth could have increased its protection by declaring a greater value and by paying a higher rate.

Hollingsworth does deny that the second requirement was satisfied, namely, a written declaration or agreement of the shipper as to the limited value of the shipment. Hollingsworth's bill of lading contained a section for a declaration. It reads:

> Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per _____.

Hollingsworth's clerk left these entries blank, so we agree with Hollingsworth that there was no declared value on the bill of lading meeting the Carmack Amendment's requirement of a "written declaration" by the shipper.

██ However, the Carmack Amendment provides in the alternative for a "written agreement between carrier . . . and shipper" as to the limited value of the shipment. The tariff provides in substance that the shipment's value is a maximum of 10 cents per pound *unless* the shipper declares otherwise. Since the shipper is charged with knowledge of the tariff, *American Ry. Express Co. v. Daniel,* 269 U.S. 40, 41–42, 46 S.Ct. 15, 70 L.Ed. 154 (1925), it follows that Hollingsworth, in leaving the declaration space blank in the bill of lading, agreed—by virtue of the

tariff's "unless" clause—to the 10-cents-per-pound maximum valuation.

As a fall-back defense, Hollingsworth argues that the bill of lading it originally prepared listed A–P–A as the carrier. Since A–P–A's tariff does not limit its liability, Hollingsworth would have enjoyed full protection had A–P–A, instead of Wilson, picked up the calendar roll. Because the carrier name was changed by Wilson's driver, not Hollingsworth's clerk, Hollingsworth argues that the bill of lading does not reflect its agreement to adopt Wilson's tariff limitations instead of the full liability available from A–P–A.

██ Normally a party to a contract may not unilaterally alter its terms. But Hollingsworth does not claim that Wilson wrote in Wilson's name without Hollingsworth's knowledge and approval. In effect, the bill of lading tendered by Hollingsworth was still a proposed agreement under negotiation when Wilson's driver sought to amend the proposal. Both parties assented to the altered form, substituting Wilson as the carrier, so the Wilson tariff was adopted as part of the written agreement. Thus, the Carmack Amendment's literal terms were met in this case.

Hollingsworth's last—and best—defense is drawn from *New York, New Haven & Hartford R.R. v. Nothnagle,* 346 U.S. 128, 73 S.Ct. 986, 97 L.Ed. 1500 (1953). There, a passenger sued the railroad after a porter lost the passenger's suitcase. The railroad invoked a tariff provision limiting recovery to $25 unless the passenger had declared a higher valuation in writing. *See id.* at 129, 73 S.Ct. 986. The Supreme Court rejected the tariff limitation because "[t]here was no 'value declared in writing by the shipper or agreed upon in writing'; in fact, not even a baggage check reciting a limitation provision changed hands." *Id.* at 135.

Since in *Nothnagle* there was no written declaration or agreement of any kind by the passenger, the decision would be irrelevant here, save that the Supreme Court continued almost immediately by making the following observation:

> [O]nly by granting its customers a fair opportunity to choose between higher or

lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained.... Binding respondent by a limitation which she had no reasonable opportunity to discover would effectively deprive her of the requisite choice....

*Id.* at 135–36, 73 S.Ct. 986 (citations omitted). This "fair opportunity" language, which was in some measure surplus, has taken on a life of its own, and later circuit cases have treated the rubric almost as if it were an independent requirement of the Carmack Amendment.[3] What has developed is a continuing controversy about how to decide whether there has been such a "fair opportunity."

The problem is that the circuit courts have not been able to agree on any single, bright-line test for what is a "fair opportunity." Partly this results from the diversity of fact-patterns (*e.g.,* obscure bill-of-lading language, affirmative carrier misrepresentations). But partly it may be due to a resistance, in the face of the "fair opportunity" language, to the ordinary law of contracts and tariffs that makes a party pretty much responsible for whatever he or she signs and charges the shipper with knowledge of filed tariffs.

This circuit has confused matters further with its decision in *Anton v. Greyhound Van Lines,* 591 F.2d 103, 107–10 (1st Cir.1978), understandably relied upon by Hollingsworth. In that case, the Air Force shipped under its own bill of lading the goods of a retiring officer who requested the shipment. *See id.* at 105. After damage occurred, the carrier invoked the tariff which contained a per-pound limit on liability. *See id.* at 106. This court rejected the limitation under the Carmack Amendment, saying that there was no "writing of plaintiff indicating any assent to a limitation of liability." *Id.* at 108.

*Anton* notwithstanding, the Air Force had acted at the officer's request in arranging the shipment, and its own bill of lading incorporated a government-shipment tariff limiting the carrier's liability to "$.60 per pound per article unless otherwise specifically annotated thereon [i.e., on the bill of lading]." *Id.* at 105 n. 2. Nowhere does *Anton* explain why this bill of lading was not a "written agreement between the carrier ... and shipper," 49 U.S.C. § 10730(b)(1), limiting value of the shipment. Manifestly, the government was either the shipper itself or, if the officer is regarded as the shipper, then the shipper's agent.[4]

In our own case, the magistrate judge thought that *Anton* had been qualified or overruled by then-Chief Judge Breyer's later decision in *Hill Constr. Corp. v. American Airlines,* 996 F.2d 1315 (1st Cir.1993). While the attitude of the *Hill* case is certainly very different, *Hill* involved the limited liability provision of an airline waybill construed by its own terms and without reference to the Carmack Amendment. Accordingly, we think it better candidly to disavow the reasoning of *Anton.*[5] Even without *Anton,* the question remains whether under *Nothnagle* there was a "fair opportunity" for Hollingsworth to choose a higher liability limit.

There are less than a dozen or so circuit court cases that touch on the "fair opportunity" question, occasionally conflating it with

---

3. *See Toledo Ticket Co. v. Roadway Express, Inc.,* 133 F.3d 439, 442 (6th Cir.1998); *Rohner Gehrig Co. v. Tri–State Motor Transit,* 950 F.2d 1079, 1083 (5th Cir.1992); *Carmana Designs Ltd. v. North Am. Van Lines Inc.,* 943 F.2d 316, 319 (3d Cir.1991); *Bio–Lab, Inc. v. Pony Express Courier Corp.,* 911 F.2d 1580, 1583 (11th Cir.1990); *Norton v. Jim Phillips Horse Transp., Inc.,* 901 F.2d 821, 824 (10th Cir.1989); *Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1415–16 (7th Cir. 1987); *Mechanical Tech. Inc. v. Ryder Truck Lines, Inc.,* 776 F.2d 1085, 1087 (2d Cir.1985); *Anton v. Greyhound Van Lines,* 591 F.2d 103, 108 (1st Cir.1978); *Boeing Co. v. U.S.A.C. Transp., Inc.,* 539 F.2d 1228, 1231 (9th Cir.1976); *Chandler v. Aero Mayflower Transit Co.,* 374 F.2d 129, 135 (4th Cir.1967).

4. The *Anton* court also said that the carrier failed to issue its own bill of lading "as plainly required by the terms of the Carmack Amendment." *Id.* at 108. But nothing in the Carmack Amendment precludes the use of a shipper's bill of lading.

5. Before declining to follow *Anton*'s reasoning, this panel circulated this opinion to all active judges on this court, and none has registered an objection. *See Trailer Marine Transp. Corp. v. Rivera Vazquez,* 977 F.2d 1, 9 & n. 5 (1st Cir. 1992). This does not preclude a petition for rehearing en banc on this point or any other.

the question whether there was an agreement at all. *See* note 3, above. In some, the shipper has prevailed, but because of some atypical quirk, such as where the carrier affirmatively misled the shipper or failed to provide a blank declaring a higher value. *See, e.g., Rohner,* 950 F.2d at 1082–84. Perhaps only four circuit cases confront the naked issue whether a "fair opportunity" is afforded by a legally adequate tariff, standard bill-of-lading language, and a blank for the shipper to insert a higher declared value.

Three of the decisions—*Mechanical,* 776 F.2d at 1088 (Second Circuit), *Norton,* 901 F.2d at 824–25 (Tenth Circuit), and *Hughes,* 829 F.2d at 1423–24 (Seventh Circuit)—uphold the limitation of liability. But of the three, only *Norton* (and a concurring opinion by Judge Winter in *Mechanical,* 776 F.2d at 1089–90) says or suggests that this is the proper result as to any commercial shipper, *see Norton,* 901 F.2d at 824–25. The panel majorities in the *Mechanical* and *Hughes* decisions can be taken to have decided the matter on specific facts (*e.g.,* how sophisticated was the shipper, who prepared the bill of lading, etc.).

By contrast, in *Toledo* the Sixth Circuit came close to finding that the carrier's standard tariff and bill of lading language, including the standard declared-value blank, neither provides the "fair opportunity" contemplated by *Nothnagle,* nor constitutes an "agreement" (for lack of an "absolute, deliberate and well-informed choice by the shipper"). *Toledo,* 133 F.3d at 443. *Toledo* implies that something close to a separate, consumer-friendly, specific warning to the shipper is necessary. *Anton* has general language reflecting the same attitude. *See Anton,* 591 F.2d at 108.

Nevertheless, among the few holdings, *Toledo*'s approach is a minority position. It undercuts general principles that make the shipper (like any other contracting party) responsible for what the bill of lading says; and it reflects a reading of *Nothnagle*'s "fair

opportunity" language that is miles away from the actual facts of that case (where the "shipper" made no written agreement or declaration of any kind). *See Nothnagle,* 346 U.S. at 129–30, 73 S.Ct. 986. Nor does it help to say that the Carmack Amendment was designed to protect shippers, where, as here, the question is how much and in what respect.[6]

■ We see no reason to choose between the "on-the-facts" approach of the Second Circuit majority in *Mechanical* and the "bright line" approach endorsed by Judge Winter in the same case (and arguably by the Tenth Circuit in *Norton,* 901 F.2d at 830 (citing Judge Winter)). It is enough that the tariff made both coverages available, the bill of lading afforded the shipper a reasonable opportunity to choose between them (it was actually proposed by Hollingsworth), and the shipper was a substantial commercial enterprise capable of understanding the agreements it signed. In our view, that is normally enough to give this shipper a "fair opportunity" to opt for more coverage in exchange for a higher rate.

Since our facts are fairly typical (apart from the last-minute switch of carrier), this outcome makes the law predictable in the ordinary case involving a sophisticated commercial shipper and standard language. Yet, as the circuit cases illustrate, there are so many variations—including inadequate bills of lading and affirmative misrepresentations by carriers—that we cannot lay down a universal rule for cases that deviate from the ordinary case.

*Affirmed.*

■

---

6. The Carmack Amendment had multiple purposes. One was to impose full-value liability on a carrier; another, after the Cummins Amendment, was to permit the carrier to limit its liability in exchange for a lower rate (so long as an option was preserved for the shipper to obtain unlimited liability protection by paying a higher rate). On the question before us—just how much information the shipper had to be provided beyond normal tariff and bill of lading language—Congress was notably silent.