# United States Court of Appeals
## For the First Circuit

No. 99-1007

CAMAR CORPORATION,

Plaintiff, Appellant,

v.

PRESTON TRUCKING COMPANY, INC.,

Defendant, Appellee.

No. 99-1008

CAMAR CORPORATION,

Plaintiff, Appellee,

v.

PRESTON TRUCKING COMPANY, INC.,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Selya, Circuit Judge,

Campbell, <u>Senior Circuit Judge</u>,

and Lynch, <u>Circuit Judge</u>.

_____

Steven R. Maher for Camar Corporation.
Wesley S. Chused with whom Looney & Grossman was on brief for Preston Trucking Company, Inc.

_____

August 15, 2000

_____

**CAMPBELL, <u>Senior Circuit Judge</u>.** Defendant-appellee Preston Trucking Company, Inc. ("Preston") lost a load of used marine equipment that it was transporting for plaintiff-appellant Camar Corporation ("Camar"). Camar sued Preston for damages under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706. The district court awarded summary judgment to Camar on the issue of Preston's liability, but limited damages for the loss to the $215 that Camar had paid to purchase the equipment. Camar appeals, arguing that its damages should be $353,370, that being the amount for which it says it could have resold the equipment. In its cross-appeal, Preston contends that it is not liable at all under the Carmack Amendment or, in the alternative, that its liability is limited by the applicable tariff to a relatively inconsequential amount. We affirm.

## I.

Camar is a company headquartered in Worcester, Massachusetts, that buys used and/or surplus naval equipment from the United States Navy's Defense Reutilization and Marketing Service ("DRMS"). It then refurbishes and resells that equipment, usually to foreign governments. In the past, Camar has resold DRMS goods to the Brazilian Navy at a very considerable mark-up above what it paid to DRMS.

-4-

Preston is a common carrier. During the two-year period preceding the events of this case, Preston transported approximately eighty shipments of freight for Camar. Camar prepared and delivered to Preston bills of lading for those shipments.

Around August, 1995, DRMS invited buyers to bid on used marine equipment located at a naval depot in California. The property was offered "as is" and prospective bidders were urged to inspect it. It was also described as "used – good condition." On August 29, 1995, Camar bid $215 for 156 pieces of equipment, including four turbines and other component parts, that ranged in age from nine to sixteen years old. The U.S. Navy had originally paid $275,000 to acquire the equipment. Camar did not inspect the used equipment, nor did it review maintenance records for it. On or about September 12, 1995, DRMS accepted Camar's $215 bid. Ninety days after the sale, according to its usual practice, DRMS destroyed the maintenance and repair records on the equipment.

Upon learning that it was the successful bidder, Camar arranged by telephone for Preston to transport the equipment from the Naval Supply Center in Oakland, California to Camar's facility in Worcester, Massachusetts. Camar sent Preston a letter of authorization to pick up the equipment, as well as a

copy of the DRMS Notice of Award reflecting the successful $215 bid price. Neither Camar nor Preston prepared a bill of lading in connection with the shipment.

Preston then arranged for WestEx, Inc., the originating carrier, to pick up the equipment in Oakland. On or about October 11, 1995, WestEx took possession of Camar's equipment and transferred it to Preston. Preston then lost the entire shipment. At this time, a tariff published with the former Interstate Commerce Commission, ICC PRES 1000-L, was in effect. That tariff provided: "If consignor fails to declare a released value at time of shipment, shipment will be subject to the lowest released value herein." As applied to "Used machinery or parts," the lowest released value was ten cents per pound ("the released rate").

On or about October 25, 1995, Camar submitted a loss claim to Preston of $137,500. This figure represented one-half of what the U.S. Navy had originally paid to procure the equipment. On November 10, 1995, Preston refused to pay Camar's loss claim, stating that its liability was limited to ten cents per pound or a total of $60 in accordance with the applicable tariff.

In December, 1995, Preston asserted that it was still searching for the missing equipment, but that it could take up

to 120 days to locate it. Camar contacted Preston in December and April concerning the search. On April 26, 1996, Camar filed an action in the United States District Court for the District of Massachusetts seeking damages of $137,500. After reviewing its records of past sales of similar goods, Camar amended its complaint to allege damages of $353,370, claiming it could have sold the equipment for this sum.

The parties cross-moved for summary judgment. In support of its motion, Camar argued that it was entitled to summary judgment with respect to Preston's liability because Preston admitted that it lost Camar's equipment, and that under the Carmack Amendment, damages should be awarded for Camar's "actual loss or injury." As to most of the equipment, Camar contended that actual loss should be measured by what foreign buyers had previously paid Camar for similar items.[1]

In opposition to Camar's motion for summary judgment and in support of its cross-motion, Preston argued that Camar had not established a prima facie case under the Carmack Amendment because it could not prove "good origin condition" of the equipment. Preston also offered two alternative arguments:

---

[1]The summary judgment record indicates that Camar valued six of the eight categories of equipment according to "past sales." It based the value of the remaining two categories of equipment on their procurement cost.

-7-

(1) even if Camar had made a prima facie case, its damages were limited to the release rate of ten cents per pound (a total of $60) based upon Preston's published tariff; and (2) even if Camar was entitled to recover for its actual loss, the only reliable evidence of such loss was the $215 Camar had paid for the equipment.

The district court allowed Camar's motion for summary judgment in respect to Preston's liability under the Carmack Amendment. See Camar Corp. v. Preston Trucking Co., Inc., 18 F. Supp.2d 112 (D. Mass. 1998). The court held that the undisputed facts demonstrated good origin condition and arrival in damaged -- i.e., non-existent -- condition. Because Preston did not limit its liability for Camar's equipment, the court concluded that it was obligated to compensate Camar for its actual loss. The court limited the value of that loss, however, to the $215 Camar had paid to DRMS to purchase the equipment, deeming any greater amount to be speculative. Both parties now appeal.

## II.

We review orders for summary judgment de novo, construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor. See Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

The 1906 Carmack Amendment to the Interstate Commerce Act governs the liability of carriers for lost or damaged goods in interstate commerce:

> A common carrier . . . subject to the jurisdiction of the Interstate Commerce Commission . . . shall issue a receipt or a bill of lading for property it receives for transportation. . . . That carrier . . . [is] liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for actual loss or injury to the property caused by (1) the receiving carrier, (2) the delivering carrier, or (3) another carrier over whose lines or route the property is transported into the United States. . . .

49 U.S.C. App. §§ 10730, 11707 (repealed 1995).[2] To make a prima facie case under the Carmack Amendment, a plaintiff must show 1) delivery to the carrier in good condition; 2) arrival in damaged condition; and 3) the amount of damages caused by the loss. See Missouri Pac. R.R. Co. v. Elmore & Stahl, 377 U.S. 134, 137-38 (1964); D.P. Apparel Corp. v. Roadway Express, Inc., 736 F.2d 1, 2 (1st Cir. 1984).

Camar contends that the district court erred in holding that the purchase price it paid the DRMS for the lost goods was the correct measure of damages. It argues that its evidence of

---

[2]These provisions were in effect at the time of the transaction at issue. Under the ICC Termination Act of 1995, Pub. L. No. 104-88, §§ 103, 109 Stat. 803, 907-08, the provisions were revised and renumbered. Comparable provisions now appear at 49 U.S.C. § 14706 (1997).

past sales of similar goods is a reasonable measure of the equipment's market value. Camar insists that as Preston was responsible for the loss and any consequent uncertainty as to the lost goods' value, the value should be determined in Camar's favor. Preston cross-appeals, arguing that the district court erred in determining that Camar had made out a prima facie case under the Carmack Amendment, and that in any event Preston had limited its liability under the applicable tariff. We turn to these points.

A.    Good origin condition

In urging that Camar failed to establish a prima facie case under the Carmack Amendment, Preston contends that Camar did not prove good origin condition. While DRMS's invitation to bid described the equipment as "used--good condition," Preston maintains that this evidence is too vague and only reflects the condition of the goods at the time of the sale, not at the time Preston took control of them several weeks later.[3]

We find adequate evidence of good condition for purposes of a prima facie case. The district court correctly reasoned that the purpose of demonstrating delivery to the carrier in "good condition" and arrival in "damaged condition"

---

[3]DRMS is required under law to be as accurate as possible in describing the goods it auctions. See 41 C.F.R. § 101-45.303-1.

is to show an adverse change in the condition of the goods while they were in the carrier's custody, thus implying that whatever harm occurred was caused by the carrier. See Missouri Pac. R.R. Co., 377 U.S. at 138 (stating that to rebut the prima facie case, a carrier must attribute the loss to a different cause).

> Because the terms "good" and "damaged" are relative, Preston's suggestion that Camar must show "good condition" in absolute terms is unfounded. In the present case, the parties do not dispute that a change in the condition of the equipment occurred while Preston had custody of it: the equipment existed at the point of origin, was delivered by WestEx to Preston and then vanished in transit. In other words, the condition of the equipment was relatively good at the point of origin and relatively bad (nonexistent) at the point of arrival.

Camar Corp., 18 F. Supp.2d at 115.

We agree with the district court that Camar sufficiently demonstrated, for purposes of making out a prima facie case, that the condition at the time Preston took possession of the equipment was "good."[4] We affirm the grant of summary judgment as to Preston's liability under the Carmack Amendment.

---

[4]While the condition of the goods in absolute terms is not relevant at this stage of a prima facie case under the Carmack Amendment, here it is relevant to the damages stage, discussed infra.

-11-

B.          <u>Limitation of liability</u>

In its cross-appeal, Preston further contends that it limited its liability to ten cents per pound pursuant to 49 U.S.C. App. § 10730 (repealed 1995, now contained at 49 U.S.C. § 14706(c)(1)(A)).  The district court erred, Preston argues, in determining that Preston did not satisfy the rules governing limitation of liability.  The court relied on factors set forth in <u>Anton</u> v. <u>Greyhound Van Lines, Inc.</u>, 591 F.2d 103, 107 (1st Cir. 1978), which require the carrier to

> 1) maintain an approved tariff, 2) issue a bill of lading prior to shipment, 3) give the shipper an opportunity to choose between levels of liability, and 4) demonstrate an "absolute, deliberate and well-informed choice by the shipper," in the form of a written agreement subscribing to the released value of goods.

<u>Camar</u>, 18 F. Supp.2d at 115 (citing <u>Anton</u>, 591 F.2d at 107).

Preston correctly notes that this court "disavow[ed] the reasoning of <u>Anton</u>" in <u>Hollingsworth & Vose Co.</u> v. <u>A-P-A Transp. Corp.</u>, 158 F.3d 617, 620 (1st Cir. 1998).  <u>Hollingsworth</u> was published after the district court decided this case. Hence, we reexamine this issue under the current case law of this circuit.

Under the Carmack Amendment, a carrier is fully liable for the "actual loss or injury to the property," 49 U.S.C. App. §§ § 11707(a) (repealed 1995), unless it takes specific actions

-12-

to limit its liability, id. § 10730(b)(1). Those actions include (1) maintaining an appropriate tariff; and (2) obtaining a "written declaration of the shipper or . . . written agreement between the carrier . . . and shipper" as to the "limited" value of the shipment. Id.; Hollingsworth, 158 F.3d at 618. Only (2) is at issue in this case, as Preston unquestionably maintained a valid tariff with the ICC containing a released rate.

In Hollingsworth, we rejected Anton's apparent requirement of a writing indicating assent to a limitation of liability in addition to a bill of lading containing a standard declared value blank:

> It is enough that the tariff made both coverages available, the bill of lading afforded the shipper a reasonable opportunity to choose between them . . . and the shipper was a substantial commercial enterprise capable of understanding the agreements it signed. In our view, that is normally enough to give this shipper a "fair opportunity" to opt for more coverage in exchange for a higher rate.

Id. at 621. We declined to create a universal rule, however, that would apply as well to cases that "deviate from the ordinary," including those cases involving inadequate bills of lading. Id.

Here, Preston argues that while neither party sent a formal bill of lading, other documents effectively constituted a bill of lading in that they contained the necessary elements,

-13-

i.e. the names of the consignor and consignee, the number of packages, and the description of the freight. See 49 C.F.R. § 1051.1 (1996). Preston points to two documents that Camar had faxed to it: the Notice of Award, Statement and Release Document from DRMS to Camar, which stated the $215 purchase price of the equipment; and the Shipment Receipt/Delivery Pass, signed by DRMS personnel. Furthermore, Preston argues, WestEx (presumably as agent for Preston) issued a "receipt" for purposes of § 10730(b)(1), in that it affixed its stickers to the above documents and obtained DRMS signatures thereon.

Even supposing that these documents amount to a bill of lading or a receipt from the carrier, they do not evidence an agreement affording Camar a reasonable opportunity to choose between the regular rate and a rate reflecting a higher level of liability. Unlike Hollingsworth, none of the relevant documents contained a declared value blank permitting Camar to declare the value of the equipment and invoke a different level of liability. See id. at 621; Rohner Gehrig Co., Inc. v. Tri-State Motor Transit, 950 F.2d 1079, 1084 (5th Cir. 1992) (bill of lading contained no declared value blank and hence did not provide shipper with reasonable opportunity to choose between two or more levels of liability). Moreover, nothing else in the documents reflects a statement by or agreement with Camar as to

-14-

the limited value of the property.  Accordingly, we conclude that this is the sort of atypical situation noted in Hollingsworth in which the bill of lading, or some equivalent, does not constitute a sufficient  agreement to limit liability.[5] See Hollingsworth, 158 F.3d at 621.  Hence, Camar's actual loss, not the released rate, is the proper measure of damages.

C.          Camar's actual loss

The district court determined that the $215 Camar paid for the equipment was its value for purposes of ascertaining Camar's actual loss and that the evidence as to lost profits was too speculative.  Within the meaning of the Carmack Amendment, "actual loss or injury to the property" is ordinarily measured by the reduction in market value at destination or by replacement or repair costs occasioned by the harm.  See Fredette v. Allied Van Lines, Inc., 66 F.3d 369, 372 (1st Cir. 1995).  The Carmack Amendment incorporates common law principles

---

[5]Preston also contends that Camar's business sophistication and the parties' past practice (in which Camar provided the bills of lading) favors a determination that Preston satisfied its obligations under Hollingsworth.  Even assuming that such factors are relevant, see, e.g., Rohner Gehrig, 950 F.2d at 1084-85 (shipper's sophistication irrelevant to whether shipper had opportunity to choose between levels of liability), they do not override the deficiencies addressed here.

of damages, see Hector Martinez & Co. v. Southern Pac. Transp. Co., 606 F.2d 106, 108 (5th Cir. 1979), and permits recovery of lost profits unless they are speculative. See Pillsbury Co. v. Illinois Cent. Gulf R. R., 687 F.2d 241, 245-46 (8th Cir. 1982); Hector Martinez, 606 F.2d at 109; Polaroid Corp. v. Schuster's Express, Inc., 484 F.2d 349, 351 (1st Cir. 1973).

To establish the dollar value of its loss, Camar submitted exhibits describing each type of lost equipment and comprising the record of its procurement and of Camar's previous sales of similar equipment to foreign buyers. For example, one exhibit includes a statement as follows:

> This is a bearing turbine, similar to the four lost by Preston Trucking. . . . On July 21, 1995 Camar sold one of these to the Brazilian Navy for $59,830. If the goods had been delivered and Camar had been able to sell the missing four at that price, Camar would have earned $239,320 on the four bearing turbines Preston lost.

Procurement history data, including the identity of the vendor and the price paid by the U.S. government, follow. Next are invoices and other documents reflecting the sale of the allegedly similar equipment to the Brazilian Navy. The other exhibits are similar, except as to two categories of equipment in which the damages calculations are based solely on the procurement history.

We agree with the district court that the evidence of past sales on this record is too speculative to form the basis of a damages award greater than the $215 purchase price. Camar's evidence did not identify any prospective purchasers for the lost used equipment at prices like those paid for the previously sold equipment, or, indeed, at any price. In his deposition testimony, Camar's president, James Mercanti, admitted that Camar had no customer for the equipment at the time of the bid or at the time Preston lost the shipment. No evidence of subsequent customer demand was submitted. Nor did Camar submit evidence tending to prove that it lost any customers or good will as a result of Preston's loss of the equipment.

Moreover, Camar describes the equipment it previously sold to the foreign navies only as "similar" to the lost goods, not identical (or even substantially similar). It is unclear whether the same prices paid for the earlier equipment would apply to the lost equipment. The lost equipment, moreover, had been used by the U.S. Navy for nine to sixteen years. There was no evidence of the effects of this use on the lost items, or the extent or nature of this past use. Hence, we cannot know whether the items were in a comparable condition to those

previously sold and thus could command comparable prices.[6] The lack of essential information about the equipment's condition is underscored by the DRMS instructions to bidders stating that "all property listed [in an invitation to bid] is offered for sale 'as is,'" and urging bidders to inspect the goods. It is true that the listed equipment was described as being in "good condition." Standing alone, however, this statement does not make up for the lack of specifics necessary to compare the value of the lost items to that of the equipment previously sold to the Brazilian Navy.

Hence, we think the district court did not err in concluding that "[t]he DRMS Notice of Award indicating Camar's purchase price of $215 is the only non-speculative evidence of the market value of the lost equipment." While Camar undoubtedly meant to sell the items profitably, and while there is evidence of past success in making profitable sales of somewhat similar equipment, its evidence fails to provide a reliable basis from which a factfinder could determine the actual value of the missing equipment. The record does not

_____

[6]Camar argues that the age of the equipment did not result in significant depreciation, because foreign governments need items of that vintage. Whether the items depreciated or not is irrelevant, however. The issue is whether the evidence in the summary judgment record established Camar's lost profits with sufficient certainty to be recoverable.

address Camar's failures nor inform us as to what proportion of used equipment purchases resulted in  profitable resales.  The low price for which Camar obtained the equipment suggests, moreover, that in the eyes of the seller and of other bidders the market for it remained quite questionable and uncertain.

Camar argues that Polaroid, 484 F.2d 349, controls the outcome of this case.  In that case, Polaroid was allowed to recover the dealer price for a shipment of photographic equipment that was hijacked en route to delivery to a Polaroid warehouse while entrusted to the defendant carrier.  The district court had found, based on the plaintiff's affidavits, that the goods were in great demand, with nothing remaining "but to unload the goods at the distribution center and to stock and take orders for them."  Id. at 350 (internal quotations omitted).  Noting that hijacked goods ultimately compete with the manufacturer and that Polaroid was the sole manufacturer of the types of products lost, we held that the plaintiff had established "a more than reasonable likelihood that the hijacked goods would have been sold at the claimed market price."  Id. at 352.

We are not persuaded by Camar's analogy to Polaroid. Here, there is little evidence of regular and consistent market demand for the lost items at a predetermined price, or that

Camar's equipment was identical to that previously sold, or was in suitable condition for immediate sale at the prices previously obtained for similar items. In contrast to the new and fungible photographic equipment, it remains an open question whether there were foreign governments who still wished to buy this particular naval equipment at prices comparable to those previously negotiated. Polaroid was permitted to recover lost profits that it was "on the verge of earning," id. at 651 (internal quotations omitted); but there is little certainty in the present record that Camar was anywhere close to earning the amounts claimed here.

Camar contends that because Preston was responsible for the uncertainty in the value of the equipment, it should bear whatever harm is caused by that uncertainty. It maintains that Preston asked Camar to wait eight months while it searched for the goods, while in the meantime, ninety days after the sale, DRMS purged its computer system of maintenance records. This shows, Camar contends, that it was Preston's fault that Camar was left without evidence as to the condition of the goods.

We are not persuaded that the consequences of DRMS's purging of its records can be blamed on Preston's conduct. Preston lost the equipment sometime after October 11, 1995. The record indicates that on November 10, 1995, Preston wrote to

Camar: "Please be advised that we are currently conducting a thorough investigation in order to locate the missing merchandise." On December 15, Camar stated in a letter to Preston that Preston had "indicated that it might take up to 120 days to find the goods." These statements fell short of evidencing a definite assurance by Preston that it would be able to locate the shipment, which both parties by then knew was missing.

Camar could prudently have proceeded then and there to gather pertinent information from DRMS, before the ninety days had passed. While Camar doubtless hoped that Preston would eventually find the equipment, it had reason to fear the worst and to take steps to document its claim. Preston's statement was not such as to mislead Camar into taking no steps to obtain the Navy's information relative to the maintenance and condition of the equipment. In any event, Preston's responsibility for the loss of the equipment does not relieve Camar of its obligation to show that there was an ongoing market for the equipment, as discussed supra. Hence, Camar retains the responsibility to produce sufficient evidence of its lost profits with reasonable certainty. See Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264 (1946).

Although mathematical precision is not required in calculating lost profits, a damages award must have a "rational basis in the evidence." Thermo Electron Corp. v. Schiavone Constr. Co., 958 F.2d 1158, 1166 (1st Cir. 1992) (quoting Jay Edwards, Inc. v. New England Toyota Distrib., Inc., 708 F.2d 814, 819 (1st Cir. 1983)). We cannot conclude, given the absence of more precise evidence as to the condition of the used goods and the current market demand and pricing for them, that a jury could rationally determine the dollar amount of Camar's lost profits in excess of $215. Hence, we affirm the district court's award of damages.

Affirmed.