[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 23, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-12210

_____

D. C. Docket No. 00-03487-CV-AJ

SASSY DOLL CREATIONS, INC.

                                                    Plaintiff-Appellee,

versus

WATKINS MOTOR LINES, INC.,

                                                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 23, 2003)

Before BIRCH, CARNES and BRUNETTI*, Circuit Judges.

CARNES, Circuit Judge:

_____

* Honorable Melvin Brunetti, United States Circuit Judge for the Ninth Circuit, sitting by
designation.

Somewhere between Florida and Texas, Watkins Motor Lines, Inc. lost a shipment of perfume it was carrying for Sassy Doll Creations, Inc. The parties agree that Watkins is liable for the lost shipment, but they disagree about the amount of that liability. Sassy Doll contends that Watkins owes it $28,273.60, the full value of the shipment and the amount Sassy Doll wrote on the bill of lading Watkins supplied. Watkins contends that it owes Sassy Doll only $10,000, the limit of liability according to the formula contained in Watkins' tariff, because Sassy Doll did not request excess liability coverage.

The dispute, which is governed by the Carmack Amendment, 49 U.S.C. § 14706, resulted in a bench trial and a decision by the district court in Sassy Doll's favor for the full value of the shipment. We affirm, because the bill of lading Watkins supplied did not give Sassy Doll "'a reasonable opportunity to choose between two or more levels of liability.'" Bio-Lab, Inc. v. Pony Express Courier Corp., 911 F.2d 1580, 1582 (11th Cir. 1990) (quoting Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1415 (7th Cir. 1987)).

**I.**

This appeal turns primarily on the contents of Watkins' bill of lading and its tariff. We begin with the bill of lading, which is a pre-printed form created by Watkins, which it provided to Sassy Doll. Manzoor Awan, who is Sassy Doll's

2

president, filled in the blanks on the bill of lading before the shipment of perfume left Florida for Texas.

The bill of lading is a one-page document with several blank spaces for the shipper to fill in with information about the shipment. The paragraph directly below the blanks for shipment and destination addresses on the bill of lading reads:

> RECEIVED subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications, and rules that have been established by the carrier and are available to the shipper, on request. . . . The shipper hereby certifies that he is familiar with all the terms and conditions of the [Uniform Bill of Lading set forth in the National Motor Freight Classification 100-X], and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

Below that paragraph, the bill of lading contains an area marked off into boxes beneath each of these (unnumbered on the form) headings: (1) "Handling Units," (2) "Number [of] Packages," (3) "HM" (hazardous materials), (4) "Kind of Packaging, Description of Articles, Special Marks and Exceptions, NMFC Item Number and Class (Subject to Correction)," and (5) "Weight (Subject to Correction)." Beneath each heading are spaces to be filled in with information corresponding to it. Awan filled in the spaces underneath the first four headings with the words: "16 Boxes of Toiletries Preparation." Under the fifth heading, "Weight," he wrote "400 Lbs."

3

On the form, a box adjacent to the headings states: "Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is specifically stated by the shipper to be not exceeding $ ___ per ___." Awan filled in that space declaring the value as: "$28,273.60 per ___." Below the shipment description and the declared value lines, the bill of lading states in bold: "Liability Limitation for loss or damage on this shipment may be applicable. See 49 U.S.C. § 14706(c)(1)(A) and (B)."

The other relevant document is Watkins' Rules Tariff WWAT 100-D. Item 780 of the tariff contains a section entitled "Property of Extraordinary Value," Part B of which states that "articles of extraordinary value, as defined below, will be accepted for shipment or as premiums accompanying other articles, providing the shipper requests excess liability coverage as provided below." The tariff defines articles of extraordinary value as "[a]rticles tendered with an invoice value exceeding the maximum value provided in Part (C)," which is "$ 25.00 per pound, per package." The tariff then states that "[s]uch articles will not be accepted for transportation unless the shipper requests excess liability coverage. Articles inadvertently accepted with an invoice value exceeding such maximum, but without excess coverage will be considered to have been released by the shipper at the maximum value provided in Part (C)," which again, is "$ 25.00 per pound, per

4

package." The tariff also provides that "[i]n the event of loss of and/or damage to any shipment, carrier's liability will not exceed the maximum value provided in Part (C), unless the shipper has requested excess liability coverage."

Part (C) contains provisions for requesting excess liability coverage. The first paragraph states in part: "If shipper desires to tender a shipment requiring carrier liability in excess of the maximum value provided below, then shipper must indicate in writing on bill of lading at time of shipment the total dollar amount of excess coverage requested (See EXAMPLE)." At the bottom of the paragraph the tariff states: "EXAMPLE: Customer requesting $10,000 additional excess coverage would enter on the bill of lading as follows: '$10,000.00 excess liability coverage requested,' or 'Excess liability coverage requested: $10,000.'" Unfortunately for Watkins, and importantly for purposes of our decision, the tariff does not state where on the bill of lading the shipper is supposed to indicate its request for excess liability coverage, and the bill of lading does not contain a section where the shipper can properly request excess liability coverage. As the district court found, "in order to comply with [the tariff] a shipper would have to write and fit its request for additional coverage somewhere on the bill of lading – in a section or box meant for something else."

Mr. Awan, who filled in the bill of lading for Sassy Doll, was not aware of the tariff's limitation of liability, and Watkins did not offer him a choice of freight

5

rates beyond what its tariff said. The freight rate to be charged did not concern Awan, however, because it was to be paid by the consignee. Awan believed that Watkins would charge a rate that reflected the stated value of the shipment, and the value he stated on the bill of lading was $28,273.60.

After Watkins lost the shipment, Sassy Doll filed a claim with Watkins for $28,273.60. Watkins offered to pay only $10,000, however, explaining that its tariff limited liability to that amount based on the 400-pound weight of the shipment multiplied by $25.00. Several days after the shipment was lost, Watkins generated a "bill of inquiry" which stated that the freight rate was $156.48, and during the claims process Watkins explained to Sassy Doll that the freight rate would have been an additional $139.00 if Sassy Doll had requested excess liability coverage in an amount sufficient to cover the value claimed. Neither Sassy Doll nor the consignee ever received an invoice or were told what the cost of shipping would be before Sassy Doll filed the loss claim.

## II.

Sassy Doll sued Watkins for $28,273.60 in state court under the Carmack Amendment, and Watkins removed the case to federal court under 28 U.S.C. §§ 1337(a) and 1441. Watkins defended on the ground that its liability was limited under the Carmack Amendment to $10,000 because Sassy Doll did not request excess liability coverage on the bill of lading. The case went to a bench trial, and

6

the district court ruled in favor of Sassy Doll for the full $28,273.60, which is the value of the perfume it had declared on the bill of lading. This is Watkins' appeal.

**III.**

We begin our analysis with the statutory framework. Under the current version of the Carmack Amendment a carrier of property in interstate commerce that loses a shipment generally is liable "for the actual loss or injury to the property caused by" the carrier. 49 U.S.C. § 14706(a)(1). However, a carrier may limit its liability "to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation." Id. § 14706(c)(1)(A). In addition to a "declaration" or an "agreement," the statute requires the carrier to provide "to the shipper, on request of the shipper, a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based." Id. § 14706(c)(1)(B); see also id. § 13710.

In Bio-Lab, Inc. v. Pony Express Courier Corp., 911 F.2d 1580, 1582 (11th Cir. 1990), we interpreted the prior version of the Carmack Amendment and set out a four-step inquiry for determining whether a carrier has effectively limited its liability. In order to do that, we said, the carrier must:

7

"(1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to his choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment."

Bio-Lab, 911 F.2d at 1582 (quoting Hughes, 829 F.2d at 1415). We held specifically that:

where the shipper has declared the value of his goods in a bill of lading a provision to the contrary in the printed portion of the document [or in a tariff] cannot operate as an agreement of the parties establishing a different value unless it is reasonably clear that the shipper was specifically aware of that provision.

Id. at 1583.

The shipper in Bio-Lab had declared the value of its shipment on the carrier's bill of lading as approximately $10,000, but the bill of lading and an applicable tariff provided for a liability limitation of $250 notwithstanding the declared value, unless the carrier and shipper executed a separate contract increasing the carrier's liability. Because there was no evidence that the shipper was actually aware of the liability limitation, we concluded that the carrier's printed bill of lading and tariff provisions did not trump the declared value the shipper had written on the bill of lading. Id. at 1582.

In Siren, Inc., v. Estes Express Lines, 249 F.3d 1268 (11th Cir. 2001), the shipper drafted a bill of lading which incorporated industry-specific terminology that included a limitation of liability. The shipper relied on Bio-Lab, but we

8

distinguished it because in <u>Bio-Lab</u> the carrier had drafted the bill of lading. We held that in a case like <u>Siren</u> "where the shipper drafted the bill of lading and incorporated industry specific terminology which . . . undisputably includes a limitation of liability," the shipper cannot avoid the liability limitation even if the shipper did not know what the industry term meant. <u>Siren</u>, 249 F.3d at 1272. In those circumstances, we concluded that the fact the shipper did not have actual knowledge of the liability-limiting attribute of an industry term was a unilateral mistake, which meant the contract was not subject to reformation without the carrier's consent. <u>Id.</u> (citing <u>Hughes</u>, 829 F.2d at 1418-19). And, of course, the carrier did not consent, or there would have been no lawsuit.

So, the pivot on which this type of case turns is that formed by the <u>Bio-Lab</u>/<u>Siren</u> ridge line. Watkins contends that this case falls on the <u>Siren</u> side, because Sassy Doll prepared the bill of lading. That depends on what "prepared" means. When we spoke in <u>Siren</u> of the shipper "preparing" or "drafting" the bill of lading, we were speaking of creation and not completion. The cases cited in the <u>Siren</u> opinion bear out that a shipper "prepares" or "drafts" the bill of lading for purposes of this rule when the shipper actually creates the bill of lading, not when it merely fills in the blanks on one the carrier has created. <u>See id.</u> at 1271-72 (citing <u>Swift Textiles, Inc. v. Watkins Motor Lines, Inc.</u>, 799 F.2d 697, 703 (11th Cir. 1986) ("[I]t is the shipper's own agent who prepared the short form bill of

9

lading on its own preprinted standardized contract form."); Am. Cyanamid Co. v. New Penn Motor Express, Inc., 979 F.2d 310, 314 (3d Cir. 1992) (stating that "[t]he released value was specified on [the shipper's] own form of bill of lading"); Hughes Aircraft Co. v. N. Am. Van Lines, Inc., 970 F.2d 609, 612 (9th Cir. 1992) (stating that the shipper "drafted the contract and directly negotiated its terms"); Mech. Tech. Inc. v. Ryder Truck Lines, Inc., 776 F.2d 1085, 1086 (2d Cir. 1985) (describing the bill of lading as "one of [the shipper's] own forms"); Nieman Marcus Group, Inc. v. Quast Transfer, Inc., Fed. Carr. Cas. ¶ 84,108 (N.D. Ill. June 21, 1999) (describing the bill of lading as a "pre-printed Nieman Marcus [the shipper's] form")).

Besides, in Siren we distinguished Bio-Lab on the ground that in that case, unlike in Siren itself, it was the carrier which had drafted the bill of lading, Siren, 249 F.3d at 1271 n.4, and all the shipper had done to the bill of lading was to fill in the blanks, Bio-Lab, 911 F.2d at 1581. In the present case, as in Bio-Lab, the carrier "drafted" or "prepared" the bill of lading and the shipper filled in the blanks. That puts this case on the Bio-Lab side of the ridge, not on the Siren side.

We also disagree with Watkins' contention that the bills of lading and tariffs in Bio-Lab and this case are distinguishable. The bill of lading and tariff in Bio-Lab are almost identical to the ones in this case. In Bio-Lab, the bill of lading had a space to declare the value of the shipment, a paragraph in the tariff purporting to

10

limit liability to a certain amount notwithstanding the declared value on the bill of lading if higher-valued goods were "inadvertently" accepted for shipment, and a provision stating that the shipper could request excess coverage in a separate agreement. Id. at 1581-82. The only difference between the relevant documents in Bio-Lab and this case is that the tariff in this case allows the shipper to request excess coverage on the bill of lading instead of requiring a separate document. Before deciding whether the documents in this case were sufficient under Bio-Lab to have provided the shipper with a reasonable opportunity to choose excess liability coverage, we need to deal with the possibility that the reasonable opportunity requirement of Bio-Lab is no longer good law.

We noted in Siren that the entire decision in Bio-Lab might need to be reconsidered in light of the changes Congress has made to the Carmack Amendment since the Bio-Lab decision came out. Siren, 249 F.3d at 1271 n.4. "[I]n a situation . . . where our authority derives from Congress, . . . a clear change in the law by Congress could . . . justify a panel of this court in not following an earlier panel's decision, where the prior panel's decision was based on legislation that had been changed or repealed." United States v. Woodard, 938 F.2d 1255, 1258 n.4 (11th Cir. 1991).[1]  For purposes of this case, the question is whether the

---

[1] Watkins contends that Bio-Lab should be revisited for the additional reason that a First Circuit case upon which it relied, Anton v. Greyhound Van Lines, Inc., 591 F.2d 103 (1st Cir. 1978), was expressly overruled by the First Circuit in Hollingsworth & Vose Co. v. A-P-A

11

reasonable opportunity to choose requirement applied in Bio-Lab survives the intervening congressional actions.[2]

When we decided Bio-Lab, the Carmack Amendment was contained in 49 U.S.C. § 11707 (1988) and 49 U.S.C. § 10730 (1988). Congress has amended the statutory frameworks twice since that decision. First, the Trucking Industry Regulatory Reform Act of 1994 ("TIRRA"), Pub. L. No. 103-311, tit. II, § 206, 108 Stat. 1673, 1684-85, eliminated the requirement that non-household goods carriers file tariffs with the Interstate Commerce Commission ("ICC"), 49 U.S.C. §§ 10702, 10762(a)(1) (1988). Second, the ICC Termination Act of 1995 ("ICCTA"), Pub. L. No. 104-88, tit. I, § 103, ch. 147, sec. 14706, 109 Stat. 803, 907-10, replaced § 11707 and § 10730 with § 14706. The ICCTA also added the subsection which requires carriers to "provide to the shipper, on request of the

---

Transp. Corp., 158 F.3d 617, 620 (1st Cir. 1998) (applying the old version of the Carmack Amendment), after Bio-Lab was decided. That does not matter to us as a panel, because the binding effect of our prior precedents in this circuit is impervious to the decisions of other circuits. See DeLong Equip. Co. v. Washington Mills Electro Minerals Corp., 997 F.2d 1340, 1342 n.1 (11th Cir. 1993) (Fifth Circuit decision overruling earlier decision of that circuit did not change status of that earlier decision as binding precedent in this circuit). We are bound to follow the Bio-Lab panel's prior decision unless the subsequent legislative overhaul of the Carmack Amendment frees us from doing so.

[2]We need not decide whether Bio-Lab's requirement that the shipper be subjectively aware of a liability limitation in a tariff is still good law, because even if it is not this case comes out the same way. Sassy Doll still wins, even if its subjective unawareness of Item 780 of Watkins' tariff is irrelevant, because Watkins failed to provide a reasonable opportunity for Sassy Doll or any other shipper using the same bill of lading to choose between two or more levels of coverage. In other words, Watkins' documents fail the reasonable opportunity to choose requirement even if the changes to the Carmack Amendment render the pertinent inquiry a purely objective one.

12

shipper, a written or electronic copy of the rate, classification, rules, and practices, upon which any rate applicable to its shipment or agreed to between the shipper and carrier is based." 49 U.S.C. § 13710(a)(1); see also id. § 14706(c)(1)(B). The legislative history of the ICCTA states that § 14706(c)(1) "is intended to return to the pre-TIRRA situation where shippers were responsible for determining the conditions imposed on the transportation of a shipment." H.R. Conf. Rep. No. 104-422, at 223 (1995), reprinted in 1995 U.S.C.C.A.N. 850, 908.

Those legislative changes are not inconsistent with the reasonable opportunity requirement, which has been part of Carmack Amendment jurisprudence for at least the past fifty years, see Hollingsworth & Vose Co. v. A-P-A Transp. Corp., 158 F.3d 617, 619-20 (1st Cir. 1998) (citing New York, New Haven & Hartford R.R. v. Nothnagle, 346 U.S. 128, 135-36, 73 S. Ct. 986, 990 (1953)), and has been applied throughout the circuits since that time.[3] "Congress is presumed to know the federal courts' interpretation of a statute that it intends to amend," and "[w]here there is no indication that Congress intended to change the meaning courts have given to the statute, we are to presume that it did not intend

---

[3] See Hughes Aircraft Co. v. N. Am. Van Lines, Inc., 970 F.2d 609, 611-12 (9th Cir. 1992); Rohner Gehrig Co. v. Tri-State Motor Transit, 950 F.2d 1079, 1083 (5th Cir. 1992) (en banc); Carmana Designs Ltd. v. N. Am. Van Lines Inc., 943 F.2d 316, 319 (3d Cir. 1991); Bio-Lab, 911 F.2d at 1582; Norton v. Jim Phillips Horse Transp., Inc., 901 F.2d 821, 824 (10th Cir. 1989); Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1415-16 (7th Cir. 1987); Mech. Tech. Inc. v. Ryder Truck Lines, Inc., 776 F.2d 1085, 1088 (2d Cir. 1985); Anton, 591 F.2d at 108; Chandler v. Aero Mayflower Transit Co., 374 F.2d 129, 135 (4th Cir. 1967).

13

any such change." Iraola & CIA, S.A. v. Kimberly-Clark Corp., 232 F.3d 854, 859-60 (11th Cir. 2000).  The statutory language concerning liability "limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper," 49 U.S.C. § 14706(c)(1)(A), is identical in all material respects in the current and previous versions of the Carmack Amendment.

As it concerns this case, the most  that can be said about the latest version of the statute is that a carrier is now required to provide a shipper with the carrier's tariff if the shipper requests it, instead of the shipper filing its tariff with the now-defunct ICC.  See Opp v. Wheaton Van Lines, Inc., 231 F.3d 1060, 1063 (7th Cir. 2000) (applying 49 U.S.C. § 14706 with the same four part test as Bio-Lab with the first part modified to reflect the statutory changes).  Nothing about that change is inconsistent with the half-century old  reasonable opportunity requirement. Notwithstanding the amendments to the Carmack Amendment, a carrier wishing to limit its liability is still required to give the shipper a reasonable opportunity to choose between different levels of liability.

That conclusion leads back to the issue of whether Watkins' documents did give Sassy Doll the requisite opportunity to choose between two or more levels of coverage.  Some cases upholding carrier liability limitations under the reasonable opportunity requirement deal with situations where the bill of lading contains a

14

declared value box, similar to the one on Watkins' tariff, but where the shipper left the box blank. See, e.g., Hollingsworth, 158 F.3d at 621; Norton v. Jim Phillips Horse Transp., Inc., 901 F.2d 821, 824-25 (10th Cir. 1989); Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1423-24 (7th Cir. 1987); Mech. Tech. Inc. v. Ryder Truck Lines, Inc., 776 F.2d 1085, 1088 (2d Cir. 1985).

The theory behind those cases is unremarkable: If the shipper fails to fill in the blanks on the bill of lading, there is no "value established by written or electronic declaration of the shipper." 49 U.S.C. § 14706(c)(1)(A). Because the shipper is charged with notice of the carrier's tariff, a provision in a tariff which limits liability to a certain amount absent a declaration of value in the bill of lading constitutes a "written agreement between the carrier and shipper," id., limiting the carrier's liability to the value provided in the tariff. See Hollingsworth, 158 F.3d at 619. In that situation, the declared value box provides the reasonable opportunity to choose a higher level of liability, and the shipper's expectation that the carrier would be fully liable for any potential loss despite a failure to declare the actual value of the shipment is no more than a unilateral mistake. See Am. Express Co. v. U.S. Horse Shoe Co., 244 U.S. 58, 61-62, 37 S. Ct. 595, 596-97 (1917); Norton, 901 F.2d at 826-27; Hughes, 829 F.2d at 1411; Hopper Furs, Inc. v. Emery Air Freight Corp., 749 F.2d 1261, 1264-65 (8th Cir. 1985); Schweitzer Aircraft Corp. v. Landstar Ranger, Inc., 114 F. Supp. 2d 199, 200-01 (W.D.N.Y. 2000).

15

On the other hand, where the bill of lading or other relevant document does not contain a declared value box, an attempted liability limitation contained in the carrier's tariff is not effective because the carrier has not given the shipper a reasonable opportunity to choose a higher level of liability. See, e.g., Camar Corp. v. Preston Trucking Co., 221 F.3d 271, 276 (1st Cir. 2000); Rohner Gehrig Co. v. Tri-State Motor Transit, 950 F.2d 1079, 1082, 1084 (5th Cir. 1992) (en banc). In those cases there is no unilateral mistake on the part of the shipper; instead, there is the absence of a reasonable opportunity for the shipper to choose different levels of coverage. See Rohner Gerig, 950 F.2d at 1084.

This case is different from either of those scenarios, because here the bill of lading does contain a declared value box which the shipper filled in with the actual value of the shipment, but the tariff requires the shipper to do something more in order to receive full protection for that declared value. The additional requirement might not be a problem if the shipper could determine from looking at the tariff and the bill of lading exactly how to indicate a desire for full value coverage. The problem arises because neither the tariff nor the bill of lading tell the shipper where on the bill of lading it can request more coverage. Even in Bio-Lab, the only case we are aware of where there was an attempt to have the tariff's liability-limitation clause trump the value declared on the bill of lading, the tariff and bill of lading told the shipper exactly how to request excess liability coverage. They instructed

16

the shipper to notify the carrier in writing of the request at least 72 hours in advance, and they specified what that notification must contain. Bio-Lab, 911 F.2d at 1581-82.

As Watkins describes it, the tariff in this case requires the shipper to complete a two-step process in order to obtain excess liability coverage: First, declare the value of the shipment on the bill of lading, and second, enter on the bill of lading a request for excess liability coverage. The problem is not with the first step, but with the second. The bill of lading contains a space specifically for declaring the value and Sassy Doll used it, but the bill of lading does not contain any space for requesting excess liability coverage. There is nowhere on the bill of lading in which a request for such coverage would not be out of place. And nowhere in the record or in Watkins' briefs on appeal is there any suggestion where on the bill of lading the shipper should write "excess liability coverage requested."

Not until he was pressed at oral argument did counsel for Watkins come forth with an idea about where on the bill of lading a shipper could indicate its request for excess liability coverage. His late-springing idea is that the shipper could place the request in the box beneath the heading marked: "Kind of Packaging, Description of Articles, Special Marks and Exceptions, NMFC Item Number and Class (Subject to Correction)." However, that box in the bill of

17

lading, particularly when considered in the context of the section containing it, appears to be intended primarily for a physical description of the shipment, and there is nothing to tip off shippers that it is the correct place to ask for more coverage.

We cannot say that the district court's finding that the tariff requires the shipper "to write and fit its request for additional coverage somewhere on the bill of lading – in a section or box meant for something else" is clearly erroneous. A shipper understandably would be hesitant to indicate its request for excess liability coverage in a space on the bill of lading meant for other information, for the same reasons that people naturally prefer to avoid disobeying instructions on a form. Forcing the shipper to express a choice where there is no proper place to do so is not providing the shipper with a reasonable opportunity to choose. Our sympathy does not go out to the drafter of a bill of lading who blames another party for the results that flow from defects in that document.

That said, we decide only the case before us. The result might well be different if the tariff indicated where on the bill of lading the shipper should indicate its request for excess liability coverage. For example, if counsel's idea at oral argument had more than advocacy-born inspiration behind it, the tariff might have stated that the shipper could indicate its excess coverage preference in the box marked "Kind of Packaging, Description of Articles, Special Marks and

18

Exceptions, NMFC Item Number and Class (Subject to Correction)." That probably would have puzzled shippers somewhat, but some guidance is better than none. Of course, the simplest thing – however foreign simplicity is to this area of the law – would be for the carrier to add an excess coverage box to its bill of lading. Carriers take heed.

**IV.**

AFFIRMED.