**UNITED STATES AVIATION UNDERWRITERS, INC.,**
Plaintiff,

v.

**YELLOW FREIGHT SYSTEM, INC., Defendant.**

No. CIV.A. 02–0883–WS–M.

United States District Court,
S.D. Alabama.
Southern Division.

Dec. 22, 2003.

Frederick G. Helmsing, Louisa Long Stockman, Helmsing, Leach, Herlong, Newman & Rouse, P.C., Mobile, AL, for Plaintiff.

H. N. Cunningham, III, James C. Baker, Roberts, Cunningham & Stripling, Dal-

las, TX, James M. Sizemore, Jr., Montgomery, AL, for Defendant.

## ORDER

STEELE, District Judge.

This matter is before the Court on cross-motions for summary judgment filed by plaintiff United States Aviation Underwriters, Inc. (doc. 15) and defendant Yellow Freight System, Inc. (doc. 19). The motions having been exhaustively briefed, they are now ripe for disposition. Upon careful consideration of the summary judgment record, the arguments and authorities presented by the parties, and all other pertinent materials in the court file, the Court finds that both motions for summary judgment are due to be **denied**, except that defendant's motion is **granted** insofar as it seeks dismissal of plaintiff's state law claims.

## I. Background.

Despite the abundance of trees felled by the parties in briefing their respective positions and proffering exhibits for the court file, the core issues presented on summary judgment are straightforward. Plaintiff United States Aviation Underwriters, Inc. ("USAU") filed this action against defendant Yellow Freight System, Inc. ("Yellow") seeking recovery of losses incurred by USAU as a result of damage to a jet engine that Yellow transported from Mobile, Alabama to Bridgeport, West Virginia in February 2002 on behalf of USAU's insured. Notwithstanding the proliferation of ancillary issues in the summary judgment filings, the paramount question presented by the cross-motions for summary judgment is whether Yellow is legally responsible for the damage to that engine.

### A. Findings of Fact.[1]

In early 2002, non-party Jemco of Pensacola, Inc. ("Jemco") hired non-party Earheart Aviation ("Earheart") to perform maintenance work on one of Jemco's aircraft whose engine was experiencing a low torque problem. (Joyner Decl., ¶ 3; Benjamin Dep., at 12–13.) Earheart decided to ship the engine, a Pratt & Whitney PT6A bearing serial number RB0049 (the "Engine"), back to the manufacturer, Pratt & Whitney ("Pratt"), for repairs. (Id., ¶¶ 3–4.) Pratt provided Earheart with a special shipping container, a triple-wall corrugated fiberboard box fitted to the contours of the Engine. (Id., ¶¶ 4–6.) On February 8, 2002, Earheart supervised the packing of the Engine into the shipping container. (Id.) The Engine was pinned and bolted onto a wooden skid, then packaged in the container supplied by Pratt. (Id., ¶¶ 6–7.)

Earheart contracted with defendant Yellow to ship the Engine from Earheart's facility in Mobile, Alabama to Pratt's service center in Bridgeport, West Virginia. (Id., ¶¶ 4, 7; Bill of Lading at Exh. E to USAU's Motion for Summary Judg-

---

1. The Court is mindful of its obligation under Rule 56 to construe the record in the light most favorable to the nonmoving party. *See Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 999 (11th Cir.1992). For that reason, with respect to each party's respective motion for summary judgment, the nonmovant's evidence is taken as true and all justifiable inferences are drawn in that party's favor. Because of the near-identity of issues and arguments in the crossmotions, application of this standard is challenging and somewhat confusing in this case.

ment.)[2] On February 8, 2002, Yellow picked up the Engine from Earheart's facility. (*Id.*, ¶ 8.) When they were loaded onto Yellow's truck, both the Engine and its container were intact and undamaged. (*Id.*, ¶ 7.)

On February 12, 2002, Yellow delivered the Engine to Pratt's service facility in Bridgeport, West Virginia. (Randy Myers Dep., at 7–8 & Exh. 2.) Randy Myers, a shipping/ receiving clerk with 14 years of service at Pratt, signed a Yellow delivery receipt for the Engine under the legend "Received in Good Condition Except as Noted by," without noting any damage to the shipment. (*Id.*) Myers does not recall receiving this particular Engine, and it is not unusual for him to receive several engines in a given day. (Myers Dep., at 5, 24.) Neither party has offered testimony from Pratt employees who specifically recall examining this Engine on the date of its arrival at the Pratt facility.

Myers explained his practice and custom for receiving engines in the following terms:

> "Once the engine is removed from the truck we do a visual check for any obvious damage. At that time we sign off on the paperwork. From there we do a check in of the engine by opening the container, removing log books, verifying serial numbers and, again, a visual check for any obvious engine damage. At that time a handwritten receiver is done and processed to sales."

(*Id.*, at 6, 20.)[3] Elaborating further, Myers stated that his normal process is to conduct a visual inspection of the exterior of the shipping container for obvious damage before signing the delivery receipt. (*Id.*, at 6–9.) He then notes any damage to the container (such as tears in the box) in writing on the shipper's freight bill. (*Id.*, at 25, 26.) After signing the freight

---

**2.** The bill of lading and certain other documents on which the parties rely in support of their respective summary judgment arguments are not presented in proper form. In particular, these documents were not authenticated by affidavit, deposition or otherwise. Generally, courts ruling on Rule 56 motions may consider only admissible evidence. *See Denney v. City of Albany,* 247 F.3d 1172, 1189 n. 10 (11th Cir.2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form.") (citation omitted). Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that those documents can be reduced to admissible, authenticated form at trial. *Bozeman v. Orum,* 199 F.Supp.2d 1216, 1222 (M.D.Ala. 2002). Those requirements were not followed as to the bill of lading. Nonetheless, there appears to be no dispute between the parties that Exhibit E to USAU's Motion is in fact a true and accurate copy of the bill of lading; as such, it is apparent that this document can be reduced to admissible, authenticated form at trial, and the Court will consider it on that basis. The same rationale applies to a num-

ber of other unverified, unauthenticated documents submitted by the parties, as discussed *infra.*

**3.** In its summary judgment filings, Yellow characterizes Myers as testifying that there was "no damage" to the Engine or the container at the time of his inspections. (Yellow Brief in Support of Summary Judgment, at 12–13.) This contention overstates Myers' testimony, which emphasized that he checked the Engine and container for "obvious damage" only. (Myers Dep. at 6, 33–34.) Myers has no formal training as an engine inspector and clearly did not engage in a detailed diagnostic examination of the Engine, but rather was confined to a brief visual inspection for obvious or readily apparent damage. (*Id.*, at 34.) This distinction is significant for Rule 56 purposes. Moreover, Myers had no specific knowledge of why the Engine was shipped to Pratt (*Id.*, at 16); as such, it is unclear how or whether he could discern between obvious shipping damage and obvious damage for which the Engine's owner was requesting repairs.

bill, Myers personally opens the container, removes the packaging and conducts a visual check of the engine itself for "obvious damage to as much of the engine as [he] can see." (*Id.*, at 9, 28.) In so doing, however, Myers does not dislodge the engine from its cradle; as such, he is unable to see the underside of the engine. (*Id.*, at 9–10.)[4] However, Myers can see, and does inspect, the entire engine except for the bottom, which is obscured by the cradle. (*Id.*, at 32.) Myers conducts such inspections on the same day an engine is received, and performs the inspections in the immediate vicinity of the loading dock in Pratt's receiving area. (*Id.*, at 16–17, 21, 22, 28–29.)

After conducting a visual inspection of the container and the engine itself, Myers' practice is to place the shipping container back on the engine and complete a receiving slip for Pratt's in-house use. (*Id.*, at 11–12, 30.) In preparing this slip, Myers notes both obvious damage to the packaging and obvious damage to the engine that he observed in his review of same. (*Id.*, at 28, 30–31, 33–34.) The receiver slip prepared by Myers for the Engine in this case identifies no such damage to either the container or the Engine. (*Id.* at 24, 28 & Exh. 2.)

There is no evidence as to what Pratt did with the Engine immediately after Myers completed his initial visual inspection. However, on February 13, 2002, one

day after Myers received the Engine, a Pratt customer service manager named John Benjamin had occasion to examine the Engine at the "teardown area" of Pratt's Bridgeport facility. (Benjamin Dep., at 9–10, 66.) The teardown area is located at the opposite end of the facility from the receiving area. (*Id.*, at 53–54.) Engines are typically transported by Pratt employees from the receiving area to the teardown area via forklift, a process which takes approximately three to five minutes. (*Id.*, at 67.) The record is devoid of evidence as to when the Engine was moved from receiving to teardown, who moved it, by what method and manner it was moved across the facility, or whether any incidents or problems occurred during the course of transporting the Engine across Pratt's facility. (*Id.*, at 59.)[5] Pratt policies require employees to complete a report of damage whenever Pratt damages goods. (*Id.*, at 71.) No such report was completed in this case, which could give rise either of two competing inferences: (i) that Pratt employees did not damage the Engine or, alternatively, (ii) that they did damage the Engine but disregarded or overlooked company policy.

In any event, when Benjamin examined the Engine in the teardown area on February 13, 2002, he observed that it had a "damaged exhaust duct port flange," including specifically a "right-hand port flange, [that] was crumpled, buckled in an

---

4. In particular, Myers testified that he could not see "the underside of the gas generator case, the underside of the exhaust duct." (*Id.*, at 11.)

5. USAU relies on Benjamin's testimony that Pratt does not "normally" damage engines when moving them across the facility. (Benjamin Dep., at 68–69.) Such a vague, conclusory statement is not credible evidence as to whether Pratt damaged *this* Engine in *this*

case, an eventuality that Benjamin allowed was "possible." (*Id.*, at 54.) Benjamin conceded that Pratt has damaged engines in handling them before. (*Id.*, at 69.) As such, and despite USAU's arguments to the contrary, Benjamin's unhelpful commentary that Pratt does not "normally" damage engines is of vanishingly low probative value, at least in its present form.

area above the actual exhaust port." (*Id.*, at 18.) According to Benjamin, the damage to the exhaust duct was "obvious" because the flange itself was crumpled and bent. (*Id.*, at 55–56.) The damaged area was "towards the top, top and side" of the Engine. (*Id.*, at 58.) It was not on the bottom of the Engine, and would not have been obscured from view by the skid. (*Id.*, at 58–59.)[6] At that time, Benjamin also observed a "curve area indentation in the double wall cardboard [of the shipping container] adjacent to the exhaust duct," with tape on the container in that same area. (*Id.*, at 19.) The indentation on the shipping container was not obvious to Benjamin. (*Id.*, at 56.)

The repairs to the Engine relating to the exhaust duct damage described by Benjamin cost more than $87,000, of which $70,663 went towards a new exhaust duct. (*Id.*, at 37–38; *see also* Exhibit O to USAU's summary judgment submission.) On March 20, 2002, USAU tendered payment to its insured, Jemco, in the amount of $87,472.76 for damage to the Engine. (Plaintiff's Supporting Documents, at Exh. P; Dean Declaration, ¶ 4.)[7] USAU then stepped into Jemco's shoes and sued Yel-

low in an attempt to recover the insurance proceeds.[8]

## B. Procedural History.

USAU initially filed this action in the Circuit Court of Mobile County, Alabama. The Complaint alleged common law causes of action against Yellow for breach of contract, negligence and wantonness. Yellow timely removed this action to this District Court on grounds of both diversity of citizenship, pursuant to 28 U.S.C. § 1332, and federal question jurisdiction, pursuant to 28 U.S.C. § 1331. With respect to the latter ground, Yellow contended that USAU's state law claims were preempted by the Carmack Amendment, 49 U.S.C. § 14706, giving rise to federal question jurisdiction. USAU did not challenge the propriety of removal, nor did it seek leave of Court to amend its Complaint to state a proper claim under the Carmack Amendment.

Both parties have now filed and briefed motions for summary judgment centering on the unpleaded Carmack Amendment claim. In addition, Yellow filed objections (doc. 27) to various materials relied on by

**6.** This testimony from Benjamin, coupled with Myers' testimony that he could see everything except for the bottom of the Engine when he inspected it, negates USAU's ill-conceived argument on summary judgment that "Myers could not see the exhaust duct." (USAU's Brief in Support of Summary Judgment, at 18.) Such unwarranted liberties with the record evidence in this case are not constructive and serve only to cloud the issues and needlessly burden the Court and other litigants in chasing down spectral facts.

**7.** As noted previously with respect to other exhibits, the check from USAU is not verified or authenticated in USAU's summary judgment submissions. Because there appears to be no dispute as to its authenticity, the Court will consider Exhibit P in ruling on the summary judgment motions; however, the better

practice would be for counsel to present Exhibit P (and all other documents it wishes the Court to accept at the Rule 56 stage) via affidavit, deposition, or other evidence authenticating the document. With respect to this particular item, it would presumably have been a simple matter to attach a copy of the check to the Declaration of Marshall Dean (Exhibit Q of USAU's summary judgment filings), and to have Dean attest to its correctness.

**8.** There is no argument by Yellow on summary judgment that USAU improperly paid the claim of its insured, or that USAU is otherwise not subrogated to the rights of Jemco for purposes of this action.

USAU in its summary judgment filings, while USAU moved to strike (doc. 35) portions of the declaration of John Hope. All of these motions are now ripe for consideration by this Court.

## II. Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH–Siegen*, 965 F.2d 994, 999 (11th Cir.1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir.1987) (citation omitted).

 The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment. *See Gerling Global Reinsurance Corp. of America v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir.2001). Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted). However, it is also true that cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts. *Id.* at 1555–56.

## III. Evidentiary Objections and Motion to Strike.

Before reaching the merits of the Motions for Summary Judgment, the Court considers the evidentiary objections raised by the parties in briefing those Motions.

### A. Yellow's Objections.

In Objections (doc. 27) filed on September 12, 2003, Yellow seeks to strike specific portions of the deposition transcript of John F. Benjamin, Jr., the Declaration of Marshall Dean, and statements in certain unsworn documents offered by USAU in support of its Motion for Summary Judgment, on the grounds that each of them contains inadmissible evidence. (Yellow Objections, at 2.)

### 1. Testimony of John Benjamin.

 Yellow's filing is directed primarily at the Benjamin deposition and, more specifically, his testimony regarding causation

of the Engine damage. Benjamin is the customer service manager at Pratt who had responsibility for the Jemco account. (Benjamin Dep., at 8.) The offending excerpts from his transcript—on which USAU relies in seeking summary judgment—relate to Benjamin's opinions that the Engine was damaged while in Yellow's control and that such damage was not caused by a forklift at Pratt.[9] Yellow argues that Benjamin has not been qualified as an expert witness, that USAU failed to comply with the expert disclosure requirements of Rule 26(a)(2), Fed.R.Civ.P., with respect to Benjamin, and that his opinions are unreliable because he lacks experience in determining the causes of damage to engine exhaust ducts. (Yellow Objections, at 3–6.) USAU counters that Rule 26(a) does not require it to furnish a written report of Benjamin's opinions to Yellow and that Benjamin is properly qualified by virtue of his mechanic's license and experience with aircraft engines to testify regarding the cause of damages to the Engine. (USAU Response to Objections, at 2–4.)

Benjamin's opinion testimony as to the type of force required to cause the observed damage to the Engine (including his opinion that such damage could not have been caused by a forklift) is clearly based on "scientific, technical, or other specialized knowledge," and is therefore outside the ken of lay opinion testimony admissible under Rule 701, Fed.R.Evid.[10] USAU argues that Benjamin's "vast expe-

9. The most controversial testimony of Benjamin in this regard is as follows:

"Q: ... And is it still your opinion that this engine was damaged during shipment?
[Objection to form omitted.]
"A: Opinion? Yes.
"Q: And you base that opinion on what?
"A: Experience.

\* \* \* \* \* \*

"Q: And how does the extent of the damage make you think it occurred while being transported on a truck as opposed to being moved on a forklift?
"A: The force it would take to make that damage to the duct.
"Q: What type of force would it have taken to make that damage to the duct?
"A: In my opinion, something more than riding a forklift through the shop.
"Q: Can you give me a quantitative amount of force that you think would cause -
"A: No, no.
"Q: the damage?
"A: No. I can't do that.
"Q: You really don't have experience making analysis of what causes damage, do you?
[Objection to form omitted.]
"A: No, I don't."

(Benjamin Dep., at 68, 70.) In addition to this specific passage, Yellow takes issue with portions of Benjamin's deposition in which he ascribed the damage to the Engine to "shipping damages" or "transportation damages." (Yellow Objections, at 4.)

10. "The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences. ... Other examples of this type of quintessential Rule 701 testimony include identification of an individual, the speed of a vehicle, the mental state or responsibility of another, whether another was healthy, [and] the value of one's property." *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196–98 (3rd Cir.1995). Benjamin's testimony as to the degree of force required to crumple an exhaust duct on a jet engine is clearly of a different tenor than those "prototypical" examples of Rule 701 testimony described in *Asplundh*. "Such is not the stuff of lay, fact testimony." *King v. Rumsfeld*, 328 F.3d 145, 153 (4th Cir.2003). In arguing to the contrary, USAU relies on *Tampa Bay Shipbuilding & Repair v. Cedar Shipping Co.*, 320 F.3d 1213 (11th Cir.2003), which is distinguishable. In *Tampa Bay Shipbuilding*, the Eleventh Circuit concluded that the opinion testi-

rience with PT6A-34 engines" renders him competent to furnish expert testimony on this topic under Rule 702. (USAU Response to Objections, at 4.) This facile argument deconstructs into a contention that just because Benjamin has worked around this kind of engine for some time, he is competent to provide expert testimony in the technical field of evaluating possible causes of engine damage. Benjamin readily acknowledged that he has no experience in analyzing causes of engine damage, and that he had no quantitative estimate of the amount of force required to damage the exhaust duct. (Benjamin Dep., at 68, 70.) Benjamin is employed as a customer service manager. He may know a great deal about aircraft engines, but the record is devoid of a showing that he possesses any specialized skill, training or knowledge as to the degree of force required to cause damage to an exhaust duct on a jet engine, much less the degree of force created by, for example dropping a 500 1b. object from a forklift at a height of several feet. Benjamin's testimony does not reveal that he performed any tests or utilized reliable principles and methods in assessing that a forklift could not have damaged the Engine. There was no rigor to his methodology or his analysis; rather, he simply provided an off-the-cuff assessment that a forklift lacked sufficient force to damage the Engine in that manner. Such speculation is unreliable, utterly unhelpful to the trier of fact, and fails to pass muster under the criteria of Rule 702, Fed.R.Evid. Accordingly, Benjamin's testi-

mony that a forklift could not have damaged the Engine in the manner observed is **stricken** as unreliable and inadmissible, and Yellow's Objection in that regard is **sustained.**

■ As to Benjamin's statements of opinion that the damages to the Engine were "shipping damages" or "transportation damages," those remarks cannot withstand Rule 701 scrutiny. Under Rule 701, a lay witness may offer opinion testimony where his opinions are "(a) rationally based on the perception of the witness, (b) helpful to clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge...." *Id.* Even assuming that the third prong is satisfied, the first two are clearly not. Benjamin lacked first-hand perception of the shipment process of the Engine or its handling by Pratt, and therefore has no rational basis for proffering an opinion that it was damaged in transit. *See United States v. Marshall,* 173 F.3d 1312, 1315 (11th Cir.1999) ("Under [Rule 701], the opinion of a lay witness on a matter is admissible only if it is based on first-hand knowledge or observation—for example, a witness' opinion that a person with whom he had spoken was drunk, or that a car he observed was traveling in excess of a certain speed."). Second, an unadorned, unfounded opinion from a fact witness that the Engine was damaged in transit by Yellow is not helpful to a jury. Indeed, "[a]n opinion is only helpful to the

mony of employees in the ship repair field as to the reasonableness of charges for a ship's repairs or whether those charges were in line with those charged by similar operations was admissible under Rule 701. *Id.* at 1222–23. In the Court's view, however, there is a vast difference between an estimator testifying as to the reasonableness of the price charged for

a ship repair, on the one hand, and a customer service manager testifying as to the amount of force required to buckle a jet engine exhaust duct, on the other. Benjamin's opinions as to whether the Engine could have been damaged by a forklift are beyond the scope of Rule 701.

jury if it aids or clarifies an issue that the jury would not otherwise be as competent to understand." *McNulty v. Citadel Broadcasting Co.*, 58 Fed.Appx. 556, 564, 2003 WL 500171, *6 (3rd Cir.2003) (citations omitted). "Lay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying." *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir.2001). A jury can look at the same evidence considered by Benjamin and reach its own conclusions as to when and how the Engine was damaged. The Court perceives nothing about Benjamin's knowledge, training or involvement as a fact witness in this case that might render his opinion as to whether the Engine was damaged in Yellow's care helpful to the jury. The first and second prongs of Rule 701 not being satisfied, Benjamin's statements of opinion that the Engine was damaged during shipment by Yellow are **stricken** as inadmissible, and Yellow's Objection to those opinions is **sustained.**[11]

■ Finally, Yellow objects to Benjamin's testimony that Pratt does not normally damage engines when transporting them from the dock to the teardown area. (Benjamin Dep., at 68–69.) Yellow contends that this statement is conclusory, hearsay, and not based on personal knowledge; however, it appears to the Court that Benjamin's testimony regarding the incidence of transportation damage by Pratt is (or at least may be) non-opinion testimony that is arguably based on his own personal knowledge as a 17–year employee of Pratt. Although the probative

value of this statement is suspect and the requisite elements of Rule 406, Fed. R.Evid., for admissible habit testimony have not yet been satisfied, the Court in its discretion will not strike it as inadmissible at this time. If it seeks to introduce such testimony at trial, USAU will be expected to lay a proper evidentiary foundation, which it has not done at this stage. Of course, Yellow will be entitled to test the basis of and foundation for Benjamin's statement at trial, and may renew its contentions relating to its admissibility at that time. Yellow's objections to this portion of Benjamin's testimony are **overruled** at this time.

### 2. *Testimony of Marshall Dean.*

■ Yellow also objects to the Declaration of Marshall Dean, a claims manager for USAU. In particular, Yellow takes issue with Dean's testimony that he issued a check to Jemco to cover "repair costs to the engine due to shipping damage." (Dean Declaration, ¶ 4.) According to Yellow, this statement concerning "shipping damage" constitutes hearsay and opinion testimony as to which Dean cannot competently testify. (Yellow Objections, at 10.)

A fair reading of the disputed portion of Dean's Declaration reflects that he is not affirmatively expressing an opinion that the Engine was damaged in transit by Yellow. Rather, he simply avers that he approved Jemco's claim based on USAU's determination that the Engine had sustained "shipping damage." It appears that Dean's testimony in this regard is being

---

11. In so ruling, the Court does not foreclose the possibility that certain casual statements by Benjamin characterizing the damage as "shipping damage" or "transport damage" may be non-opinion evidence that may be admissible as relating to his state of mind or some other hearsay exception. Therefore, the Court's determination today is confined to Benjamin's direct statement of opinion that the Engine was damaged during shipment by Yellow.

offered not for the truth of the matter asserted, but rather to explain Dean's motive, intent and state of mind in approving the insurance payment to Jemco. *See* Rule 803(3), Fed.R.Evid. On the record before it, the Court believes Dean's statement concerning shipping damage may be admissible for that limited purpose, albeit not for its truth. Yellow's Objection to Dean's Declaration is **overruled**.

### 3. Other Documents.

 Finally, Yellow objects that three documents accompanying USAU's Motion for Summary Judgment are unsworn and unauthenticated. (Yellow Objections, at 11–12.) In particular, Yellow singles out the Proof of Loss (Exhibit B), a letter from Earheart Aviation regarding the packing and pickup processes for the Engine (Exhibit D), and a letter from Benjamin to Jemco itemizing repair costs for the Engine (Exhibit O). As stated in footnote 2, *supra*, "[i]n considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form." *Denney v. City of Albany*, 247 F.3d 1172, 1189 n. 10 (11th Cir.2001) (citation omitted). In general, documents must be properly authenticated to be considered at summary judgment, unless it is apparent that they can be reduced to admissible, authenticated form at trial. *Bozeman v. Orum*, 199 F.Supp.2d 1216, 1222 (M.D.Ala. 2002). Yellow is correct that the proper practice on a Rule 56 motion is to authen-

ticate documents through affidavit or deposition; indeed, that practice should be followed as a matter of course in all proceedings in this District Court.[12] That said, Yellow does not contest that Exhibits B, D and O are in fact true and correct copies of the documents they purport to be; as such, the Court, in its discretion, will consider those exhibits at this time, it appearing that they can be reduced to admissible, authenticated form at trial; provided, however, that nothing herein excuses USAU from making a proper foundational showing with respect to those documents at trial.

As for Yellow's objections to the statements in the Proof of Loss (Exhibit B) and the Benjamin letter (Exhibit O) regarding alleged "shipping damage," the Court's analysis is identical to that with respect to the Dean Declaration and the Benjamin deposition. To the extent that those statements constitute opinion testimony under Rule 701 or 702, they are inadmissible. However, it appears likely that those statements may be offered for some non-opinion purpose by USAU, in which case they may pass muster under the analysis set forth above. For that reason, the Court will **overrule** Yellow's objections at this time, subject to renewal at trial depending on how and for what purpose USAU seeks to introduce this evidence, and whether a suitable foundation is laid.

### B. USAU's Motion to Strike.

 Not to be outdone by Yellow's evidentiary challenge, USAU filed a cursory

---

**12.** USAU responds that the Proof of Loss (Exhibit B) is notarized. (USAU Response, at 5.) This argument misses the point. The mere fact that a person signed the original Proof of Loss under oath does not authenticate Exhibit B as a true and correct copy of that original. Again, the proper procedure would be to attach this document as an exhibit to an affida-

vit on summary judgment, and to have that witness attest to the exhibit being a true and correct copy of the original. This procedure should be observed in all cases. With a modicum of effort and minimal inconvenience, this type of evidentiary dispute can be readily averted.

Motion to Strike Portions of the Declaration of John Hope (doc. 35),[13] in which it "objects to any statement by John Hope regarding the state of the engine when packaged for shipping." (Motion to Strike, at ¶ 1.) USAU further complains, with no elaboration, that the photographs of the Engine attached to Hope's Declaration "do not indicate where the damage is located." (*Id.*, at ¶ 2.)

USAU's Motion is much ado about nothing. A fair reading of the Hope Declaration reflects that he makes no representations as to the condition of the Engine when it was packaged for shipping. To be sure, Hope suggests in his declaration that "a wood skid was utilized for shipping" and that "the Engine was placed for shipping" on a wood skid with metal brackets and a metal saddle. (Hope Declaration, at ¶¶ 4, 5.) There is no dispute that the Engine was shipped in that fashion. Moreover, Hope's testimony is merely that at the time he examined the Engine it was still on the skid used for shipping. The Court discerns nothing in his testimony regarding "the state of the engine when packaged for shipping," nor did USAU elaborate on its concern in this regard.

USAU's objection to the photographs appended to the Hope Declaration is equally unfounded. USAU offers, with no amplification, a conclusory assertion that the photographs "do not indicate where the damage is located." (Motion to Strike, ¶ 2.) This contention is difficult to reconcile with the photographs themselves, which contain arrows purporting to delineate precisely where on the frame of the Engine the damage is found. In his Declaration, Hope testified as to each arrow on each photograph, identifying the damage reflected. (Hope Decl., ¶¶ 5–6.) USAU does not rebut or cast doubt on the veracity of Hope's representations, nor does it contend that the photographs do not accurately depict the Engine or that the arrows do not point to damage areas. With no elaboration from USAU and nothing facially improper about the photographs, the Court is at a loss to understand the basis of USAU's objection.

For the foregoing reasons, USAU's Motion to Strike is **denied** in its entirety.

## IV. Analysis of Subsidiary State Law Claims.

### A. *Preemption of State Law Claims.*

■ As stated *supra*, USAU's Complaint against Yellow sounds in exclusively state law causes for breach of contract, negligence, and wantonness, all of which seek recovery of the insurance proceeds USAU paid to Jemco for damage to the Engine. Yellow devotes nearly half its brief in support of summary judgment (doc. 20) to arguing that USAU's state law claims are preempted by the Carmack Amendment, 49 U.S.C. § 14706. According to Yellow, "[t]he Supreme Court has held in no uncertain terms that the Carmack Amendment supersedes all state laws purporting the govern the liability of interstate carriers for goods lost or damaged during interstate shipments." (Yel-

---

13. The "me, too" character of this Motion is underscored by USAU's citation to but a single case, *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 883 (9th Cir.1982), on which Yellow relied heavily in its Objections filed two weeks earlier. Ironically, USAU cites *Zoslaw* for the proposition that documents submitted on summary judgment must be "authenticated by affidavits or declarations," when it is USAU—not Yellow—that so broadly flouted this requirement with respect to its summary judgment submissions in this matter.

low Brief in Support of Summary Judgment, at 6.) [14] Far from arguing the point, however, USAU freely acknowledges that the sweeping preemptive ambit of the Carmack Amendment encompasses this case, as its brief states as follows:

> "To accomplish the goal of uniformity, the Carmack Amendment creates a single cause of action, and **preempts all other state law claims** arising from failures in the transportation and delivery of goods."

(USAU Brief in Support of Summary Judgment (doc. 16), at 15–16 (emphasis added).)

As the parties are in accord that the Carmack Amendment effectively wipes out all three common law causes of action pleaded in the Complaint, there can be no question that Yellow is entitled to judgment as a matter of law on the breach of contract, negligence, and wantonness claims set forth in the Complaint.[15] Accordingly, Yellow's Motion for Summary Judgment is **granted** as to the state law causes of action identified in the Complaint, and all such causes of action are **dismissed with prejudice** as being preempted by the Carmack Amendment.

### B. Status of Unpleaded Carmack Amendment Claim.

This development leaves the status of the Complaint in an unusual posture that the parties neither recognize nor address in their briefs. On its face, the Complaint does not assert a Carmack Amendment claim, but instead sounds exclusively in state law causes of action that the parties now agree are preempted. The parties blithely assume that this action can proceed under the Carmack Amendment, even though USAU has not directly interposed such a claim here. (See Yellow Brief in Support of Summary Judgment, at 11; USAU Brief in Support of Summary Judgment, at 15.)

The obvious, yet heretofore unspoken, question is whether there is any claim left for USAU to pursue at this time. The state law claims—the only ones it has affirmatively pleaded against Yellow—are admittedly preempted. Whether anything in the Complaint survives dismissal of all three causes of action set forth therein hinges on the type of preemption at work here. If the Carmack Amendment belongs to the extremely narrow band of federal statutes to which the doctrine of complete preemption applies, then USAU's state law claims are effectively transformed into a federal claim under the Carmack Amendment, notwithstanding their expressed state law character. See Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (explaining that complete preemption doctrine allows state law claim to be recharac-

---

14. This position finds overwhelming support in the case law. See, e.g., Nichols v. Mayflower Transit, LLC, 2003 WL 21981994, *2 (D.Nev. June 19, 2003) ("Circuit Courts of Appeals, including the Ninth Circuit, have unanimously held that Carmack's broad scope preempts all state law claims.").

15. There being no dispute as to the preclusive effect of the Carmack Amendment, and the parties both advocating for that very result in their summary judgment submissions, this Court questions why the parties found it necessary to present this issue on summary judgment. Surely a more efficient approach would have been for the parties to stipulate that USAU's state law claims should be dismissed under the Carmack Amendment. Better still, USAU could have sought leave of Court to file an amended complaint, excising those state law claims that it readily admits are preempted while pleading a properly formulated cause of action under the Carmack Amendment.

terized as an action arising under federal law); *Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 123 S.Ct. 2058, 2063, 156 L.Ed.2d 1 (2003) (where a federal statute completely preempts state law, "a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law"); *Hoskins v. Bekins Van Lines,* 343 F.3d 769, 773 (5th Cir.2003) (where complete preemption applies, a plaintiff's "cause of action is either wholly federal or nothing at all"); *Ervast v. Flexible Products Co.,* 346 F.3d 1007, 1014 (11th Cir.2003) (noting that super preemption "recharacterizes the state law claim into a federal claim"). By contrast, if the Carmack Amendment merely provides defensive preemption, then the dismissal of the state law causes of action on preemption grounds leaves no claims in play, and there is no automatic conversion of the state law claims into their federal analogue. *See Ervast,* 346 F.3d at 1012 n. 6 (explaining effect of "defensive preemption" as simply requiring dismissal of state law claims, with no element of converting claims into federal claims); *Butero v. Royal Maccabees Life Ins. Co.,* 174 F.3d 1207, 1212 (11th Cir. 1999) (defensive preemption provides only an affirmative defense, requiring dismissal of state law claims without furnishing federal jurisdiction).

▪ Employing a needlessly risky (or simply inattentive) stratagem, USAU assumes that complete preemption attaches to the Carmack Amendment, so as to allow an unpleaded federal claim to withstand dismissal of state law claims on preemp-

tion grounds.[16] Even though USAU does not specifically argue for complete preemption, its theory (namely, that an unpleaded Carmack Amendment claim can survive even after all state-law claims pleaded in the Complaint are dismissed) makes sense only if viewed through that prism. Accordingly, employing a liberal construction, the Court will view USAU's filings as arguing that the Carmack Amendment completely preempted its state law causes of action, effectively mutating them into a Carmack Amendment claim without formal amendment of the Complaint.

▪ Hence, the Complaint survives the preemptive effect of the Carmack Amendment only if the doctrine of complete preemption attaches to that statute. The doctrine is a narrow one, applying only when "the pre-emptive force of a statute is so 'extraordinary' that it converts an ordinary state common-law complaint into one stating a federal claim." *Caterpillar v. Williams,* 482 U.S. 386, 393, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). The Eleventh Circuit has emphasized that complete preemption is "narrowly drawn" and that it has been applied "hesitatingly" by the Supreme Court with "no enthusiasm" for extending it to other contexts. *Blab T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.,* 182 F.3d 851, 854–56 (11th Cir.1999); *see also* 14B Wright & Miller, *Federal Practice & Procedure* § 3722.1 ("Because of the obvious federalism implications of the complete-preemption doctrine, its application has been extremely limited by the courts.").

---

16. As mentioned *supra,* USAU could have easily circumnavigated this landmine by seeking leave of Court to file an amended complaint stating a claim under the Carmack Amendment. To assume that its state law claims are automatically exalted into federal claims—without presenting supporting argument—is to risk dismissal of the entire Complaint, should that assumption prove incorrect.

Historically, federal courts have been badly splintered as to whether the Carmack Amendment is subject to complete preemption, with a comparable number of jurists championing each position. *Compare Lamm v. Bekins Van Lines Co.,* 139 F.Supp.2d 1300, 1309–10 n. 4 (M.D.Ala. 2001) (finding no complete preemption under the Carmack Amendment and citing to numerous cases ruling on both sides of the issue) *with Stephenson v. Wheaton Van Lines, Inc.,* 240 F.Supp.2d 1161, 1166 (D.Kan.2002) (embarking on detailed analysis and recognizing complete preemption under Carmack Amendment). Fortunately, the Supreme Court broke the logjam earlier this year in *Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003), in which it extended the complete preemption doctrine to embrace certain claims preempted by the National Bank Act. Significantly, the Court both streamlined and demystified its complete preemption analysis by announcing that "the proper inquiry focuses on whether Congress intended the federal cause of action to be exclusive," rather than (as many courts had held) on whether Congress intended the federal claim to be removable. 539 U.S. at —— n. 5, 123 S.Ct. at 2064 n. 5. Thus, in deeming the National Banking Act subject to complete preemption, *Beneficial* reasoned that because the Act "provide[s] the exclusive cause of action for such claims, there is, in short, no such thing as a state-law claim of usury against a national bank." 539 U.S. at ——, 123 S.Ct. at 2064. This ruling profoundly impacts the reasoning of many decisions rejecting complete preemption in the Carmack Amendment setting.

In the aftermath of *Beneficial,* only two courts have weighed in on whether the Carmack Amendment is subject to complete preemption. In *Hoskins v. Bekins Van Lines,* 343 F.3d 769 (5th Cir.2003), the Fifth Circuit, undertaking a detailed analysis of the Carmack Amendment in light of *Beneficial* and reversing its previous position, held as follows:

> "We are persuaded ... that Congress intended for the Carmack Amendment to provide the exclusive cause of action for loss or damages to goods arising from the interstate transportation of those goods by a common carrier. Accordingly, we hold that the complete preemption doctrine applies."

*Id.* at 778. Likewise, in *New Process Steel Corp. v. Union Pacific Railroad Co.,* 2003 WL 22533559 (5th Cir.2003), the Fifth Circuit reaffirmed its *Hoskins* decision that state law tort claims for negligence in interstate shipments are completely preempted by the Carmack Amendment and therefore necessarily arise under federal law. *Id.* at *3.

■ The Court agrees with the Fifth Circuit that *Beneficial* removes all reasonable question as to whether complete preemption applies in a Carmack Amendment context. Some 90 years ago, the Supreme Court opined with regard to the Carmack Amendment that "[a]lmost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it." *Adams Express Co. v. Croninger,* 226 U.S. 491, 506, 33 S.Ct. 148, 57 L.Ed. 314 (1913); *see also New York, N.H. & H.R. Co. v. Nothnagle,* 346 U.S. 128, 131, 73 S.Ct. 986, 97 L.Ed. 1500 (1953) ("With the enactment in 1906 of the Carmack Amendment, Congress superseded diverse state laws with a nationally uniform policy governing interstate carriers' liability for property loss.").

Based on these precedents and the Court's own review of the statute, it is

evident that Congress intended the Carmack Amendment to provide the exclusive cause of action for damage to goods in interstate transportation by a common carrier. Under a *Beneficial* analysis, complete preemption applies and USAU's Carmack Amendment claim survives dismissal of all state law claims on preemption grounds. In other words, through the magic of "jurisdictional alchemy" (to quote Justice Scalia's dissent in *Beneficial*), USAU's state law claims morph into a federal Carmack Amendment claim, there being "no such thing" as a state law claim against a common carrier for damage to goods in interstate transportation. Thus, though it may be invisible to the naked eye, USAU's Carmack Amendment claim does exist.[17]

## V. Analysis of Carmack Amendment Claim.

### A. Parties' Legal Burdens.

■■■■■■ The allocation of burdens in Carmack Amendment suits is well established. A plaintiff must first establish a *prima facie* case, proving by a preponderance of evidence that "(1) the goods were delivered to the carrier in good condition, (2) the goods arrived at the destination in damaged condition, and (3) a specified amount of damages resulted." *A.I.G. Uruguay Compania v. AAA Cooper Transp.,* 334 F.3d 997, 1003 (11th Cir. 2003); *Fuente Cigar, Ltd. v. Roadway Express, Inc.,* 961 F.2d 1558, 1560 (11th Cir.

1992); *Fine Foliage of Florida, Inc. v. Bowman Transp., Inc.,* 901 F.2d 1034, 1037 (11th Cir.1990). A *prima facie* case should not rest on mere possibility. *Offshore Aviation v. Transcon Lines, Inc.,* 831 F.2d 1013, 1015 (11th Cir.1987). If the plaintiff makes a sufficient showing at the *prima facie* level, the burden shifts to the defendant to prove both that it was not negligent and that the damage was caused by one of five excusable factors, including: (i) an act of God, (ii) public enemy, (iii) act of the sender of the goods, (iv) public authority, or (v) the inherent vice or nature of the goods. *A.I.G. Uruguay,* 334 F.3d at 1003. If the carrier/defendant fails to meet its burden, then liability is established, leaving only the question of damages. *Id.*

### B. Plaintiff's Prima Facie Case.

In their respective filings, the parties bitterly contest whether USAU has made the requisite *prima facie* showing. With regard to the first element, USAU has presented uncontested testimony that the Engine was in undamaged condition when Earheart released it to Yellow. In particular, the uncontroverted evidence before the Court is that when Yellow picked up the Engine from Earheart on February 8, 2002, it was properly and securely packed, and both the Engine and its shipping container were intact and undamaged. (Joyner Decl., at ¶¶ 6–7.) Clearly, USAU has satisfied the first element of the *prima facie* case.

---

17. Notwithstanding this determination, the more prudent practice for a plaintiff knowingly filing preempted claims is to seek leave to amend the complaint to replead those claims as proper federal causes of action, rather than relying on the fortitude and ingenuity of the court to seek out and voluntarily conduct a complete preemption analysis to which the parties' summary judgment filings allude in only the vaguest of ways, much less to apply this narrow, extraordinary complete preemption doctrine in a manner recognizing a viable phantom federal claim. After all, the path of lesser resistance may be for a court to construe the preemption as defensive, thereby eradicating all state law claims with no judicial sleight of hand creating a federal claim in their wake.

Similarly, there is no reasonable question that USAU has met the third element of its *prima facie* case through an unrebutted showing that the cost to repair the Engine (including replacing the exhaust duct) exceeded $87,000. (Benjamin Dep., at 37–38; *see also* Exhibits O & P to plaintiff's summary judgment submission; Dean Decl., at ¶ 4.) Yellow has not disputed the sufficiency of USAU's showing in this regard to satisfy the "specified amount of damage" prong of the *prima facie* case.[18]

Accordingly, USAU's ability to establish a *prima facie* case stands or falls with the second element, namely, whether the Engine arrived at Pratt in damaged condition. This narrow question consumes dozens of pages in the parties' respective briefs. For its part, Yellow insists that "the undisputed evidence demonstrates that the goods at issue were delivered in good condition to the consignee at final destination by Yellow." (Yellow Brief in Support of Summary Judgment, at 11.) In this regard, Yellow relies heavily, indeed exclusively, on the testimony of Randy Myers, Pratt's employee who received the shipment, visually checked the container and the Engine for obvious damage, and signed off on a delivery receipt and an internal receiving slip form without noting any damage. (*Id.*, at 11–12.) By contrast, USAU contends that it is "apparent that the engine arrived at Pratt & Whitney in damaged condition." (USAU Brief in Support of Summary Judgment, at 18.) In support of its argument, USAU leans on Benjamin's testimony regarding the damage he discovered the day after Pratt received the Engine, discounts Myers' testimony as unhelpful, and cites the paucity of evidence that Pratt actually damaged the Engine. (*Id.*, at 18–19.)

■ When the condition of goods is in question, "reliable, substantial circumstantial evidence of condition will suffice to prove a prima facie case." *A.I.G. Uruguay*, 334 F.3d at 1004; *Fuente Cigar*, 961 F.2d at 1561 ("Substantial and reliable circumstantial evidence, direct evidence, or a combination of the two may be employed to prove the second element of the claim."); *Penske Logistics, Inc. v. KLLM, Inc.*, 285 F.Supp.2d 468, 472 (D.N.J.2003) ("In establishing what type of condition the goods arrived in, a claimant must provide reliable evidence, direct or circumstantial, that proves the condition of the goods by a preponderance of the evidence.") However, a "much greater degree" of circumstantial evidence is needed to establish the second element of the *prima facie* case than would be necessary if direct evidence were used. *Fuente Cigar*, 961 F.2d at 1561 n. 6.

■ USAU insists that it is entitled to summary judgment because it has established a *prima facie* case based on the lack of evidence that the Engine was damaged at Pratt. In the opposite corner, Yellow argues that it is entitled to summary judgment because Myers testified that the Engine arrived at Pratt's facility in an undamaged state, thereby precluding USAU from making a *prima facie* showing. After careful review of the record, including particularly the deposition testimony of Myers, the Court finds a genuine issue of

---

**18.** In finding that USAU has met its *prima facie* burden of establishing a specified amount of damages, the Court makes no determination that USAU's damages necessarily equate to the $87,000 figure. In Carmack Amendment cases, the appropriate measure of damages is "limited to reasonably foreseeable damages, which is a question of fact relegable to a jury." *Offshore Aviation*, 831 F.2d at 1016.

material fact as to the condition of the Engine when Yellow delivered it to Pratt. Each party reads the shaky evidence in the light most favorable to itself, while disregarding adverse inferences that arise from the ambiguous and inconclusive summary judgment record.

As noted *supra,* Myers did *not* testify that the Engine and its packaging were in a wholly undamaged, pristine state when Pratt received them. Rather, he testified that his failure to make notations of damage on the freight bill and receiving slip show that his limited visual inspection of both the Engine and its shipping container disclosed no *obvious* damage.[19] What is obvious damage? The answer likely lies in the eye of the beholder.[20] It is impossible to discern from Myers' deposition excerpts whether he would have deemed the kind of damage observed with respect to the Engine and the box one day later as "obvious" shipping damage. Myers was not trained as an engine inspector; therefore, it is not evident whether this type of damage would meet his subjective definition of "obvious" shipping damage. One possible inference from Myers' testimony is that he would not have considered this kind of damage "obvious." Another possible inference is that he might have viewed the exhaust duct damage as the defect for which Jemco had shipped the Engine to Pratt for repairs; after all, he did not know why the Engine had been sent to Pratt. A more exhaustive examination of Myers might have revealed the kinds of

damage that he considers "obvious" shipping damage to an aircraft engine. Such questions either were not asked or were omitted from the deposition excerpts supplied by the parties. As a result, the Court can only speculate as to what Myers was looking for and whether a damaged exhaust duct and slightly indented shipping container would have triggered a concern in his mind that the Engine had been damaged in transit, so as to warrant a notation of damage on Pratt's receiving slip.

Had Myers testified that the Engine and box were unblemished when he examined them on February 12, 2002, Yellow's position that the uncontroverted evidence shows the Engine to have been undamaged at that time may be quite persuasive. But that it is not what Myers said. In characterizing Myers' testimony as being that the Engine was undamaged when Pratt received it, Yellow draws an inference extending well beyond the actual words used by Myers under oath. That inference is plausible, but it is not required. The above discussion reflects another, equally plausible inference that may be drawn from Myers' testimony, to-wit: He did not consider the exhaust duct damage as the kind of obvious shipping damage that he notes on a freight bill or internal receiving slip. It is not the province of this Court to select between conflicting, rational inferences from the record evidence. As such, the Court cannot determine whether USAU has established a *prima facie* case

19. Myers had no recollection of this particular Engine; therefore, his testimony was confined to his usual practice and custom, as well as to interpreting the documents that he prepared and/or signed relating to Pratt's receipt of that Engine.

20. In his deposition, Benjamin testified that the damage to the Engine that he observed

the day after its arrival at Pratt was "obvious," but that the damage to the shipping container was not. (Benjamin Dep., at 55–56.) However, it is unclear whether Benjamin and Myers apply the same normative standards in designating particular damage as "obvious."

under the Carmack Amendment. Simply put, there is a genuine issue of material fact as to whether the Engine was in damaged condition when Yellow delivered it to Pratt. This critical question cannot be resolved at the Rule 56 stage.

This conclusion is reinforced by the veritable black hole of evidence regarding the fate of the Engine while it was under Yellow's control from February 8 to February 12, 2002. How did Yellow ship the Engine? How was it secured in the shipping process? How was it transported? Were there any problems? Through what mechanism do Yellow employees identify or report problems with the transport of goods? Was that mechanism invoked here? Similarly undeveloped is the record concerning what happened to the Engine while it was in Pratt's control from February 12 to 13, 2002. What happened to the Engine after Myers completed his inspection? Who else looked at it? Who moved it? When? How? Were there any problems? [21] The sparse record raises more questions than it answers, and these lingering queries conspire to create a genuine issue of fact as to the condition of the

Engine at the moment of its delivery to Pratt on February 12, 2003.[22]

Because there are genuine issues of material fact concerning USAU's *prima facie* case (and specifically the condition of the Engine upon delivery to Pratt), the parties' cross-motions for summary judgment as to Yellow's liability under the Carmack Amendment are **denied.**

## VI. Other Issues on Summary Judgment.

### A. Yellow's Right to the Benefit of Insurance Provided by USAU to Jemco.

As an alternative basis for summary judgment, Yellow maintains that it is entitled to the benefit of Jemco's insurance with USAU, and that its liability "is limited to the amount of the premium paid by [Jemco] for the insurance policy pursuant to which Jemco was paid by Plaintiff for the damages to the goods at issue herein." (Yellow Motion for Summary Judgment, at 3.)

 As a general rule, when a bill of lading contains a "benefit of insurance"

---

**21.** USAU speculates that the Engine was "moved one time, a fairly short distance on the same floor level, via forklift, traveling approximately five miles per hour." (USAU Opposition Brief, at 7.) However, there is little indication in the record that this sequence of events, in fact, accurately describes what happened to this Engine. More importantly, there is no testimony from anyone involved in moving this Engine as to what exactly happened.

**22.** In denying Yellow's bid for summary judgment, the Court does not adopt USAU's reasoning in opposing Yellow's Motion. USAU argued that Yellow was not entitled to summary judgment because: (1) Benjamin testified that a forklift could not have damaged the Engine in this manner; (2) Pratt rarely damages items when moving them by forklift; (3) no one at Pratt ever filled out a damage

report; and (4) immediately after the damage was discovered, Pratt, Jemco and USAU all "consistently took the position" that Yellow was at fault. (USAU Opposition Brief, at 6–7.) Benjamin's opinion as to whether a forklift could cause such damage has been stricken, *supra*. Similarly, the Court has deemed the bare contention that Pratt rarely damages goods to be *a propos* of nothing. Further, the self-interested finger-pointing of Pratt, Jemco and USAU as to Yellow's culpability is not summary judgment evidence. The only one of these factors that may have some legitimate bearing on the evidentiary issues presented is the absence of a damage report by Pratt employees, but even that evidence requires a substantially greater foundation than has been furnished by USAU to date.

clause extending to the carrier the benefit of insurance coverage held by the goods' owner, that clause is valid unless the insurance policy contains provisions to the contrary. *See United States v. Auto Driveaway Co.*, 464 F.2d 1380, 1383 (7th Cir.1972) ("benefit of insurance" clause is permissible and enforceable, provided that the "clause must not contravene terms of any owner's insurance policy"); *Mohl v. NTC of America, Inc.*, 564 F.Supp. 401, 404 (D.Colo.1982) (benefit of insurance clause "does not give the carrier the benefit of insurance, when to do so would, under the terms of the contract of insurance, invalidate the insurance").[23]

■ Yellow maintains that the bill of lading in this case had an implicit "benefit of insurance" clause, inasmuch as the bill expressly stated that it was governed by "all the bill of lading terms and conditions in the governing classification and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns." (Gertsema Declaration, ¶ 4 & Exh. 1.) According to Yellow, applicable terms and conditions for the Uniform Domestic Straight Bill of Lading (which it contends are at issue here) are found in the National Motor Freight Classification 100–Y series, which provides in part as follows:

> "Any carrier or party liable for loss or damage to any of said property shall have the full benefit of any insurance that may have been effected, upon or on

account of said property, *so far as this shall not avoid the policies or contracts of insurance* . . . ."

(*Id.*, ¶ 5 & Exh. 2. § 3(d) (emphasis added).)

Assuming that Yellow's analysis of the bill of lading is correct, that document did implicitly include a "benefit of insurance" provision. Reading the bill of lading terms and conditions in conjunction with the case law cited above, Yellow is entitled to the benefit of Jemco's insurance coverage with USAU if the extension of that benefit to Yellow would not have the effect of avoiding or otherwise conflicting with Jemco's insurance contract with USAU.

Yellow states in conclusory fashion that the applicable policy in this case "will not be avoided by Yellow's entitlement to the benefit of that insurance." (Yellow's Brief in Support of Summary Judgment, at 17.) However, perusal of the insurance contract between Jemco and USAU reveals otherwise. Particularly revealing is a provision captioned "Rights against third parties," which states as follows:

> "This insurance is for your benefit alone and not for any other person or organization. Except for what you agree to do under an Airport Contract, you promise not to do anything that will take away our right to collect for damages caused by others."

(Baker Declaration of Aug. 7, 2003, at ¶ 6 & Exh. D.) Also included is an "Our right of recovery" section, which gives USAU a right of subrogation and requires the in-

---

**23.** In opposition, USAU contends that in *Prime Source Corp. v. Auto Driveaway Co.*, 2000 WL 830738 (E.D.Pa.2000), a federal district court "rejected the *Auto Driveaway* case as authority for the proposition that a carrier may claim benefit of a shipper's insurance." (USAU Opposition Brief, at 11.) The *Prime Source* court did no such thing. To the contrary, as clearly shown by the passage cited by

USAU in its brief, the Eastern District of Pennsylvania at least implicitly adopted the Seventh Circuit's analysis, including its determination that a "benefit of insurance" clause in a bill of lading has no effect when the policy includes an endorsement effectively conflicting with that clause. 2000 WL 830738, at *3.

sured to promise "not to do anything that will interfere with [USAU's] chances of recovery." (*Id.*)

An act by Jemco purporting to extend USAU's coverage to Yellow would clearly violate the "Rights against third parties" provision. Further, if the "benefit of insurance" provision were to be enforced, the "effect of giving to the carrier the benefit of the insurance is ... to destroy any right of subrogation in the insurer." *Mohl,* 564 F.Supp. at 404. Thus, if Jemco extended the benefit of its insurance to Yellow, it would cause Jemco to violate its promises to USAU under both the "rights against third parties" provision and the subrogation provision in the instant policy. This is precisely the sort of conflict that negates a "benefit of insurance" clause under both the case law and the Uniform Domestic Straight Bill of Lading.[24]

Based on the foregoing, this Court finds that Yellow is not entitled to the full benefit of insurance procured by Jemco through USAU for the Engine. Yellow's Motion for Summary Judgment on that basis is **denied**.

### B. Amount of Damages.

Finally, USAU seeks summary judgment as to the amount of damages to

which it is entitled. In this regard, USAU maintains that it is entitled to recover the full amount of its actual loss for the damage to the Engine (totaling $87,472.76) because Yellow failed legitimately to limit its liability to a specified value or amount. (USAU Brief in Support of Summary Judgment, at 21–28.) Of course, the issue of damages comes into play only after USAU establishes a *prima facie* case under the Carmack Amendment which Yellow fails to rebut. *See, e.g., A.I.G. Uruguay,* 334 F.3d at 1003 (after liability is established, "[t]he inquiry then becomes the amount of damages and, usually, whether the carrier legitimately limited its liability for the shipment to a specified value or amount"). In light of the Court's findings above, this case remains at the *prima facie* stage; accordingly, any resolution of damages issues at this time would be premature. For that reason, the Court **denies** USAU's Motion for Summary Judgment on damages, subject to USAU's right to renew its motion at an appropriate juncture if and when Yellow's liability is established.[25]

### VII. Conclusion.

This case presents a whodunnit worthy of a Sir Arthur Conan Doyle novel. An

---

**24.** The Court's analysis on the "benefit of insurance" topic generally tracks the approach identified by USAU in opposition to Yellow's Motion for Summary Judgment. Whether from overconfidence or futility, Yellow chose not to address the "benefit of insurance" issue in its reply brief; therefore, the Court does not know whether or how Yellow might rebut USAU's persuasive analysis of the relevant policy provisions in light of the obvious limitations on the "benefit of insurance" doctrine. Yellow explained this omission through a footnote stating that it strongly believed USAU had failed to establish a *prima facie* case, and that such a failing mooted the need for it to respond further to the "benefit of insurance" issue. (Yellow Reply Brief, at 10 n. 8.) Yellow having placed its eggs in one

basket, it is not the obligation of this Court to formulate arguments that Yellow opted not to raise. After all, the Federal Rules of Civil Procedure do not obligate this Court to read the minds of counsel or to construct arguments or theories of relief for them that they have failed to raise and that are not reasonably presented on the face of their filings. *See Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.").

**25.** Notwithstanding the lack of ripeness of the damages issue, the Court notes that this issue appears to be governed by the Eleventh Cir-

airplane engine left Mobile in an undamaged state. Twenty-four hours after its delivery to a repair facility in West Virginia, the engine was found to be badly damaged. Did the carrier do it? Was it the repair facility? The record reveals clues, but no sufficiently solid, uncontradicted evidence to enable the Court to crack the case. For that reason, the cross-motions for summary judgment of USAU and Yellow (docs. 15 and 19) are both **denied** as to Yellow's liability under the Carmack Amendment.

Furthermore, the Court **orders** as follows:

1. Yellow's Motion for Summary Judgment is **granted** as to USAU's state-law claims, and such claims are **dismissed with prejudice** as preempted by the Carmack Amendment;

2. Yellow's Objections (doc. 27) are **sustained** as to the opinion testimony offered by Benjamin regarding the sources and causes of damage to the Engine, but are otherwise **overruled**;

3. USAU's Motion to Strike (doc. 35) is **denied**;

4. Yellow's Motion for Summary Judgment is **denied** insofar as it seeks a

ruling that Yellow is entitled to the full benefit of Jemco's insurance coverage on the Engine; and

5. USAU's Motion for Summary Judgment as to the amount of damages to which it is entitled is premature given that no finding of liability can be made at this time. As such, this aspect of USAU's Motion is **denied**, subject to renewal at an appropriate juncture.

---

cuit's recent decision in *Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.*, 331 F.3d 834 (11th Cir.2003). In *Sassy Doll*, the court rejected the carrier's attempt to limit liability for lost or damaged shipments where the bill of lading did not provide the shipper with "a reasonable opportunity to choose between two or more levels of liability." *Id.* at 836. Of potentially critical import for this case, the *Sassy Doll* court concluded that the carrier had failed to limit liability where "neither the tariff nor the bill of lading tell the shipper where on the bill of lading it can request more coverage." *Id.* at 842. Thus, the *Sassy Doll* bill of lading impermissibly required the shipper "to write and fit its request for additional coverage somewhere on the bill of lad-

ing—in a section or box meant for something else," and there was nothing on the bill to tip off the shipper as to the correct place to ask for more coverage. *Id.* at 843. Simply put, "[t]here is nowhere on the bill of lading in which a request for such coverage would not be out of place." *Id.* At first blush, *Sassy Doll* appears squarely on point, as the Yellow bill of lading appears to suffer from the very infirmities discussed in *Sassy Doll.* Accordingly, while this Court makes no findings as to the damages issue, it appears that if USAU is able to establish liability, Yellow may face a formidable obstacle in extricating this case from the grasp of *Sassy Doll.*